[Civ. No. 3250. Third Appellate District.—December 10, 1927.]

LILLIE B. BEERS, Respondent, v. CALIFORNIA STATE LIFE INSURANCE COMPANY (a Corporation), Appellant.

C. E. McLaughlin, McLaughlin & McLaughlin and Jerome D. Peters for Appellant.

Ware & Ware for Respondent.

HART, Acting P. J.—This action was instituted by the plaintiff to recover on a life insurance policy for $1,000, issued by defendant to Nellie L. Beers, daughter of the

plaintiff, and in which policy the latter was the named beneficiary.

The cause was tried before a jury and a verdict returned in favor of plaintiff. Judgment was entered accordingly, from which the defendant prosecutes this appeal in conformity with the provisions of section 953a of the Code of Civil Procedure.

While complaint is made of certain rulings, involving the question whether certain evidence was or was not admissible, and also the legal integrity of the action of the court in allowing and disallowing certain proffered instructions to the jury is challenged, the point the most vigorously urged is that for the verdict and the judgment no claim can justly be made that they derive substantial support from the evidence.

It appears that on the third day of November, 1925, the defendant issued a policy of insurance on the life of Nellie L. Beers in and for the sum of $1,000, to run for a period of twenty years, in consideration of the annual payment by said Nellie L. Beers (to be referred to hereinafter as Miss Beers or "the deceased") of a premium of $46.66; that, upon the issuance of said policy Miss Beers paid to the defendant said sum; that, as above stated, Miss Beers was the daughter of plaintiff, and the latter was made by her (Miss Beers) the beneficiary of said policy, to be paid upon the death of the insured within the term during which the policy was to run; that on the fifth day of March, 1926, and "while said policy of life insurance was in full force and effect," said Miss Beers died, at Chico, Butte County; that, thereafter, and prior to the commencement of this action the plaintiff duly provided the defendant with proofs of the death of her said daughter, but the defendant, for reasons to be later explained, refused to pay the plaintiff the said sum of $1,000. These facts are, in appropriate language, alleged in the complaint.

The answer, by way of a plea of confession and avoidance, admits the salient averments of the complaint, and then alleges:

"That the said policy of life insurance number 45285, executed and delivered by defendant to Nellie L. Beers as set forth in the complaint herein, contained a clause reading as follows:

" 'In case of suicide of the holder, committed while sane or insane, within one year from the date hereof, the limit of recovery hereunder shall be the total amount of the deposit paid,' and defendant further alleges that said policy of life insurance was executed and delivered by defendant to said Nellie L. Beers on the 3rd day of November, 1925, and that on the 5th day of March, 1926, at Chico, Butte County, California, the said Nellie L. Beers ended her life by taking and swallowing strychnine, with the intent and purpose then and there to commit and she did then and there commit suicide. That defendant hereby, in accordance with the terms of said policy of life insurance, offers to pay and tenders to plaintiff the sum of $46.66, in full satisfaction of the obligation of defendant, under the terms of said life insurance policy."

The foregoing involves a statement of the ground upon which the defendant resists payment to the plaintiff of the sum which the policy issued to the deceased provided for, and constitutes the important point of this controversy.

It is admitted that the policy of insurance contains the provision that the self-inflicted death of the deceased within one year from the date of the issuance of the policy, whether committed while the insured was sane or insane, would operate to vitiate the force of the policy.

It is further admitted that, after the due proof of the death of the insured had been submitted to and filed with the defendant by the plaintiff, and demand by the latter was made upon the former for payment of the policy, the defendant tendered to plaintiff a check for $46.66, representing the amount of the premium paid to the defendant by the deceased upon the issuance and delivery by it of the policy to her, but that plaintiff refused to accept the check.

The testimony affords no reasonable ground for doubting that the deceased died from the effects of strychnine poisoning. Indeed, there was not at the trial any controversy upon that proposition. The single question submitted to the jury for decision was whether the poison was self-administered with a suicidal intent, and, the jury having arrived at and returned a verdict negativing the suicide theory, the question as to that issue which is submitted for decision here is whether this court is required to hold, as

a matter of law, that the result thus reached by the jury is devoid of sufficient support in the evidence. The evidence upon that question consists entirely of circumstances, certain of which, it must in frankness be conceded, with more or less directness lend color to the defendant's theory of suicide, and yet, when those same circumstances are viewed in the light of certain other evidentiary considerations, disclosed by the evidence, it becomes, from the standpoint of a reviewing court, a problem, not free from difficulty, to account for the fact of the death of deceased upon the theory that it was purposely self-imposed. The situation so presented, therefore, seems to lead to the conclusion that the case, as to the evidence, is one in which a court of review is required to accept the conclusion arrived at by the jury. To be more explicit, upon the question whether Miss Beers took the poison by mistake or with the deliberate purpose of destroying her life, the evidence, taken as a whole, is of a character, as to its evidentiary significance and effect, that renders the deductions to be drawn therefrom necessarily, peculiarly and entirely subject to the interpretative function and discretion of the jury.

The general facts may and will be narratively stated herein, specific reference being given to such portions of the testimony as are deemed of special importance in their effect upon the conclusion herein arrived at.

At the time of her death Nellie L. Beers was between nineteen and twenty years of age. Her mother resided about two miles from the city of Chico. The deceased, however, had been for some time prior to her death residing at 434 Olive Street, Chico, with Mr. and Mrs. Ed Miller, the latter being her sister. Although devoid of preliminary educational training, she conceived an ambition to become a stenographer and concluded to attend part-time school at the Chico High School, taking special training in stenography, and took up her residence with her brother-in-law and sister, above named, because it was more convenient to the school. It appears that the Millers had been residing for some time in a rented house, but had in process of construction a home of their own at 1230 South Broadway, Chico. It further appears that the contractors engaged in constructing the house were slow in completing it and it was not ready for occupancy for some time after the

date on which the Millers contemplated removing thereto.
On the twenty-seventh day of February, 1926, the deceased
called at the drug-store at which she and the Millers had
been accustomed to making purchases and purchased a bottle
containing one-half ounce of strychnine sulphates. She di-
rected the druggist to charge the strychnine to her personal
account. It appears that she was at liberty to buy such
articles as she might want and as are found in a drug-store
and charge the same to her brother-in-law and sister, al-
though the druggist stated that occasionally she would have
some of her purchases charged to herself personally. She
signed her own name to the written order required as a
prerequisite to sales of poison. She stated to the druggist,
when purchasing the poison, that she wanted it for the pur-
pose of destroying rats with which, she stated, the basement
of the house in which they were then residing was infested.
Neither Mr. nor Mrs. Miller knew of this purchase.

A few days thereafter, although the new house of the
Millers was not completed, the latter, nevertheless, removed
thereto. The deceased at the time of the removal was not
at home, and, although she expected that the removal might
take place at any time, she was not aware of the fact that
it had taken place until she returned from school in the
afternoon. At this juncture it is well to say that several
weeks prior to the death of Miss Beers she and her sister,
Mrs. Miller, went to San Francisco and purchased furniture
to be installed in the new home of the Millers. The deceased
bought a bedroom set for herself and also purchased a type-
writer. On the evening of March 4, 1926, the deceased,
accompanied by Joe Magill, David Boyd, and a Mrs.
Charlotte Hill, attended a moving picture show in Chico.
It seems that there was also to take place that evening at
the home of some friends of the Millers a social gathering
of friends. The Millers and a Miss Opal Faulkner, who
was temporarily stopping with the deceased at the Millers',
decided to attend the party while the deceased expressed
a preference to attend the theater party above mentioned.
The deceased left her home for the theater about 8 o'clock
P. M. After leaving the theater the party went to a tamale
parlor to partake of refreshments. Each of the party,
excepting Magill, among other things, ate an enchilada.
While there they joined in singing several songs, one of

which is entitled, "You Will Be Sorry Because You Cheated on Me," and another in the singing of which they all joined is entitled "A Bicycle Built for Two." During the evening Magill and Boyd spoke of engagements which would take them away from Chico, Boyd saying that some employment at Redding would take him away. The deceased thereupon said that she, too, intended going some place that the rest of the party "did not know." The witnesses Boyd and Magill testified that while the talk was going on about "going away" the deceased was "jolly" and good-natured. Magill positively testified that no intoxicating liquors were used by any of the party at the tamale parlor and further that not only on that occasion he saw no intoxicating liquor, but on no other occasion when he was with the deceased did he ever see intoxicating liquor around or see the deceased use intoxicating liquor of any character or in any form. Leaving the tamale parlor, they drove about town for a short period in the automobile of Boyd, who did the driving. Between 11:30 and 12 o'clock they reached the home of the Millers. Magill got out of the automobile, assisted the deceased out and accompanied her to the door and bade her "good-night" and the deceased thereupon entered the house. Magill returned to the auto and was driven to his home, and Boyd and Mrs. Hill left for their respective places of residence. Between the hours of 12 and 1 o'clock of the morning of the fifth day of March, the Millers and Miss Faulkner returned from the party above spoken of and entered the house. It appears that the interior of the house not then being entirely completed, the Millers and the deceased and Miss Faulkner occupied the same room, there being two beds therein. On going into the room they found the deceased in bed. They engaged in a general conversation, in the course of which the deceased asked the Millers and Miss Faulkner some questions regarding the party which they had attended and also whether or not they had had an enjoyable time. In turn, the deceased was asked by the Millers and Miss Faulkner whether or not she had had a pleasant evening, to which the deceased replied that she "had a wonderful time." It was shown that on the right-hand side of and very near the bed occupied by the deceased and Miss Faulkner there was a table upon which Miss Faulkner noticed a glass containing water. The glass

was almost full. The deceased slept on the right-hand side of the bed and near and convenient to the table and the water. A short time after they had all retired the deceased exclaimed in a loud voice, addressing her sister, Mrs. Miller, "Teddy dear," and Mrs. Miller, being aroused, asked her what she wanted. The deceased said, "I am awful sick." "And," Mrs. Miller continued to testify, "I asked her what was the matter and she did not answer me. She hesitated and I said, 'What is the matter, Nellie?' and she didn't answer me, and I jumped out of bed and Ed (her husband) jumped out of bed and we all jumped out of bed and I grabbed her and I think she had gone into a convulsion. I said, 'What is the matter, Nellie?' and she said, 'I am awful sick; I can't live very long'; and I said, 'What is the matter with you?' and she said, 'I don't know.' I said, 'What makes you feel that way?' and she said 'I don't know—I just feel like I am not going to live very long.' I asked her if she had taken any laxative or anything, because that is all I had in the house to take; I had no medicine there except hair tonics. She said, 'No.' I said, 'Have you eaten anything?' and she said, 'No, only an enchilada.' And I told her, I said, 'You are just nervous, Nellie,' and she said, 'Well, I feel awful bad. . . . I feel like I am not going to live very long.' She said to send for mother and Joe."

Dr. Burke, a physician in Chico, was immediately sent for and soon arrived at the house, it then being about 2:25 A. M. When he entered the room he noticed that the deceased was in a convulsive condition; she was lying on her abdomen and her head was thrown back in a spasm. The doctor immediately administered ether to the deceased for the purpose, as he declared, of stopping the convulsions. "Finally," testified the doctor, "that ceased and she ceased breathing then and I administered artificial respiration, and as soon as I did that she started in with another convulsion and she became quite cyanotic or blue." She had three convulsions while the doctor was with her and died within ten minutes after his arrival at the Miller home. Dr. Burke stated that the symptoms indicated that strychnine poison was the cause of the young woman's death. At the post-mortem examination Dr. Burke conducted an autoptical examination of the body of the deceased. He removed

the stomach and forwarded it to Dr. Ernest Victors, of San Francisco, a specialist in "medical diagnosis and laboratory analysis," which specialty, the doctor stated, embraces the "examination of the contents of the human stomach." Dr. Burke, at the autopsy, made a careful examination of the genitals of the deceased and found, as he testified, that they were perfectly intact or normal. In other words, his examination of her procreative or generative organs established to his satisfaction that the young woman had been sexually pure or undefiled; that his examination disclosed that she had been "very healthy"— that is, "she was (physically) a robust young girl." Dr. Victors received the stomach, with specific instruction to subject it to a diagnostic analysis with the view of discovering whether it contained strychnine therein. His report was, in substance, that he found "partially purified strychnine" in the stomach, and that his opinion was, from the quantity which he subjected to an analysis, that there was taken into the stomach between one and two grains. He further stated that the stomach "was almost empty. It contained," he continued, "two or three ounces of emulsion"; that it contained no solid matter. The doctor further stated that it "would be (or is) very common" for a person taking strychnine poison without knowing it to say (as deceased said), upon the effect of such poison being felt for the first time by such person and "before the first spasm": "I feel sick. I feel that I am not going to last very long." In other words, Dr. Victors said that the sensation produced in the system of one taking such poison, even where he did not know that he had taken it, will naturally cause the person to feel as if he was going to die, and so to express himself. Dr. Victors was unable to state definitely, in the absence of a full history of the case, of which he was not in possession, his opinion as to the length of time which probably intervened between the time at which the poison was taken and the time at which death occurred.

Miss Faulkner testified that, on hearing the deceased make the request that her mother and "Joe" be sent for, at the same time saying she "was going to die," she (witness) immediately telephoned to Joe Magill, telling him of the serious condition of Miss Beers. About the same instant of time, Ed Miller, in his automobile, departed in haste

for the home of the mother of the deceased for the purpose of conveying her to the bedside of her stricken daughter. Within a few minutes after thus being informed of the serious illness of Miss Beers, Magill appeared at the Miller home and was followed shortly by the return of Miller with deceased's mother. The witness testified that she and the deceased worked together as waitresses at Richardson's Springs during the preceding fall; that they became fast friends and, on leaving the springs, she, with deceased, went to the Miller home, where they resided until the death of Miss Beers. She stated that the deceased was a robust, healthy person; that she never knew of her being sick or heard her complain of being sick prior to the time of the illness causing her death; that she and the deceased became and were confidential with each other; that the deceased was, apparently, always happy and (witness in effect stated) acted like one having no serious or troublesome cares; that deceased was an attractive girl and was popular with her acquaintances, old and young; that she never, in witness' presence, exhibited by her actions, conduct, or words any evidence of carrying concealed sorrows or disappointments, nor, said the witness, did she ever hear of the deceased having confided to others that she was troubled from any cause, or betrayed in the presence of others heart sorrows or disappointments or discontentment of any nature. Miss Faulkner also testified that some days prior to the death of the deceased, she (the witness) and Miss Beers had planned to visit and, in fact, had settled upon visiting the following week for a brief period some friends of the witness residing at the "Engel Mine"; that deceased seemed to be very happy in contemplating the prospective visit, and with cheerful expectancy spoke of it the day or evening preceding her death.

Joe Magill testified that he became acquainted with the deceased some five or six weeks only prior to her death, and that during that period he had frequently been in her company; that they were not "sweethearts," but merely "good friends." He stated that he had never had any trouble or angry words with the deceased; that there was no quarrel or any exhibition of jealousy by any of the members of the party at the theater or at the tamale parlor. While they (Boyd, Mrs. Hill, the deceased, and the witness) were

taking a ride about the city after leaving the tamale parlor, Miss Beers said that she desired to go home because she had her lessons to study for the following school day. As he was leaving the Miller house, on escorting deceased to the door on the night in question, Magill said he asked deceased whether "we will go to the dance Saturday night" to which question, in as pleasant a manner as she had always acted, replied: "You better come down to-morrow night." The witness stated that, after he arrived at the Miller home the morning of the death of Miss Beers, he heard someone in the room suggest that possibly the enchilada she had eaten at the tamale parlor was the cause of her illness; that, acting on that suggestion, and subsequent to the passing of Miss Beers, knowing that Boyd and Mrs. Hill had also eaten enchiladas, he called at their respective homes to ascertain whether they, too, were suffering from an attack similar to that which resulted in the death of Miss Beers, but that he found that they were "all right." It will be remembered that Magill himself did not partake of an enchilada on the occasion referred to.

Mrs. Edna Miller testified that deceased was her favorite sister; that deceased had lived at her (witness') home for about five or six months prior to her death and during that period was taking a course in stenography. "She was perfectly welcome at our home," said Mrs. Miller (as Mrs. Miller's husband also testified). The deceased had never spoken to the witness about purchasing poison, nor did witness know that the deceased had ever purchased poison. Mrs. Miller stated, however, that the deceased had always been "morbidly afraid of rats," and that she never would go into the rat-infested basement of the house, where their linen and clothes were customarily washed and laundered, to attend to the washing of her own clothes; that, as a result, whenever deceased desired to do any of her own washing, Mr. Miller was required to remove, for the temporary purposes of the deceased, the washtub to the kitchen or the floor on which were maintained the living-rooms. Mrs. Miller further said that the deceased earned money and saved it; that she was always well provided with clothes; that she was, as to all her activities, social as well as the more serious angles of life which she caused to be of particular concern to her, singularly optimistic and con-

tented—in short, the deceased was, declared Mrs. Miller, always cheerful and happy in all her undertakings; that the deceased attended school "of her own free will," and that whenever she referred to her school work she expressed herself as being satisfied with the progress she was making in her studies. Proceeding, Mrs. Miller said that the deceased had been tendered two different opportunities to marry young men, both of whom were persons of ample financial means, and that in each of those cases she was offered an opportunity, upon her marriage, to make a tour of Europe; that the young men referred to were members of families of high standing and were themselves of high personal character; that the deceased refused those matrimonial prospects. "She always said," testified Mrs. Miller, "that she was not ready to marry." The witness further stated: "It did not occur to me that night (the night or morning of Miss Beers' death) that she might be poisoned. In fact, I thought it was ridiculous when I heard them speaking of poison." Ed Miller, who, as seen, was the brother-in-law of Miss Beers, corroborated in all substantial particulars his wife's testimony regarding the life and personal characteristics of the deceased. He supported the statement of Mrs. Miller that the deceased was afraid of rats, and that she (deceased) would never, for that reason, go into the basement of the house in which formerly they (the Millers) had resided, and also supported the testimony of Mrs. Miller as to the circumstances occurring the day and evening before and on the morning of her death. He testified that he knew nothing of the purchase of poison by the deceased until after her death. First explaining that he had a farm a short distance from Chico which he himself personally managed and that it was his custom to arise early every morning and leave his home in the city to go to his farm, he testified that on the evening of the 4th of March, 1927, as he, with his wife and Miss Faulkner, was about to depart for the party which they intended to and did attend, the deceased requested him to awaken her before he left for his farm the following morning (the 5th), as she was required to do some studying before going to school. Miller stated that, three or four days before her death, deceased said to him, or in his presence, that, as soon as school was out for the term, she intended, with

Miss Faulkner, to visit friends at the Engel Mine, and thence go to Susanville. "In fact," said Miller, "my wife intended to go with them."

George B. Whitney, a brother-in-law of deceased, testified that deceased was an attractive young woman, always popular with her acquaintances and was of a "sunny, cheerful disposition," and apparently was always happy. Witness knew of no reason why she should not have been happy.

Mrs. James Kelly, of the faculty of the Chico High School, and as such director of part-time education, testified: That she had under her supervision students under compulsory attendance and also special students, over the age of eighteen years, engaged in special work; that deceased came within the latter class and was under her (witness') supervision. She said that she knew deceased; that she first called on the witness and stated "she felt quite beyond the age of compulsory attendance, but that she was very anxious to become a stenographer." The witness said that, after questioning her regarding any previous general school training she might have had, she (witness) planned a program for Miss Beers which would "fit her for her life's work as a stenographer. She was," continued Mrs. Kelly, "doing very creditable work, excepting in English, and she was making an extra effort to overcome that. . . . Her view of life was very optimistic. She was very happy. I talked to her the day preceding her death. That very day . . . I had sent for her, as I do my students once a week, being allowed two hours to interview different pupils, and I asked how she was getting along in her work and she said she was getting along fast. I asked her if she was happy, and she said: 'Mrs. Kelly, I never was so happy in my life and I feel I am just getting what I wanted. . . . ' That was the last day she was in school. Those are the exact words because I recalled them the next day. . . . She was very natural (referring to the day preceding her death) and always a happy girl and always smiling and a great favorite with her teachers because of her optimistic views and cheerfulness; and she was always ready to meet their requests."

Two young ladies attending the school—Miss Longmire and Miss Mims—testified that they knew deceased, having first met her at school, and that on the day preceding that

of the death of the deceased, the teacher announced in open school that there was to be a picnic for the students the following day, and requested those who could not or did not intend to attend the festivities to "raise their hands," and that among a number thus indicating their intention not to attend the picnic was the deceased. Miss Longmire said that although she never had talked to the deceased, from her observations of the latter's mannerisms, she concluded that she (deceased) was very quiet and "distant" in disposition. "I liked her," said the witness, "but she seemed to want to be by herself. . . . She held herself aloof from the other girls." The witness added, though, that the girls that deceased "sat with (in school) she talked with, and I sat on the other side of the room and I did not have occasion to talk to her. . . . She was very pretty and a little bit older than the rest of us girls." Miss Longmire said that attendance by the students at the picnic was not compulsory, nor were those not attending under duty to give any reason therefor.

Douglas B. Miller, teacher of English in the Chico High School, testified that the deceased was in two of the classes conducted by him and had been for about five or six weeks prior to the date of her death. He testified: That, "on the whole, I should say she (deceased) was rather cheerful, but I noticed long before the time that she passed away that she seemed to be a girl of moods—that is, there were times when she seemed to be cheerful and other times when she seemed to have something on her mind, or acted that way. She did not act as cheerful as at other times." On cross-examination, the witness said: "It seemed that Nellie had a greater handicap to overcome, due to being out of school, and she had to try harder than the other students, which she did; but I cannot say that her results were as good as the average student."

The witness, George B. Whitney, being recalled, testified that on the afternoon of the 5th of March, 1927, upon the request of the chief of police of Chico, he searched the Miller premises (the place where Miss Beers passed away) and, in the back yard of said premises, picked up a bottle containing what on investigation was found and pronounced to be strychnine, "about five or six ordinary steps" from the room in which the deceased died. "The place where

I found that bottle," he said, "a person would have to go through the dining-room and through the kitchen out the back door." The bottle was standing, "in open sight," in a slightly inclined position against "some little twigs and things that had accumulated under a small tree that was standing there." Whitney also testified that, on the same occasion, he searched the stove in the kitchen of the Miller house and found therein a piece of blue paper, of the kind commonly used in wrapping small articles.

Floyd S. Bush, pharmacist at the drug-store where deceased purchased the strychnine, testified that, on the 27th of February, the deceased visited the store and called for strychnine, saying she desired to use it for killing rats, of which, so she said to the witness, there were many "out to the house." Miss Beers signed (as required by law) a written or the required form of application, whereupon the witness delivered to her in a bottle "one-half ounce strychnine sulphates," she directed the witness to charge it to her personal account. The bottle bore a label on which were the words, "strychnine sulphates one-eighth ounce," or "strychnine sulphates, sixty grams." The witness issued and delivered a duplicate charge slip to the deceased. This slip the deceased, as she was in the act of leaving the store, rolled and dropped on the floor in front of the wrapping counter. Immediately upon her departure, the witness picked up the slip and threw it into a waste basket. Bush, being shown the piece of blue wrapping paper found by the witness Whitney in the kitchen stove in the Miller house, identified it as the paper with which he wrapped the bottle containing the strychnine powder he sold to the deceased. He stated that the deceased generally directed purchases she made at the store to be made against her brother-in-law, Ed Miller, but that occasionally she directed small purchases to be charged to her personal account. He (the witness) said that the sale of strychnine for the purpose of destroying rats was not an unusual experience in the store or with druggists—that, in fact, the purpose for which such poison was ordinarily purchased was to destroy rats infesting the premises of the purchasers. He had known Miss Beers, he said, for quite a period of time; that she had been in the store and made purchases "the last six months" prior to her death oftener than she had previous

to that. He had met her socially and knew her fairly well. The day on which she procured the poison, he stated, "she seemed to be very light-hearted and gay and walked out, and there was nothing to indicate any reason for her to buy that outside of for rats, as she said." There was nothing "embarrassed or strained, or unnatural or unusual about her manner on that occasion." The witness was shown the bottle assumed to have been the one containing the poison sold by him to the deceased, and upon an inspection of it said that at least eight grains of the poison had been removed therefrom.

There has now been incorporated herein an accurate synoptical presentation of all the vital testimony received at the trial. In assembling the ✴facts, as thus they were revealed, the transcript has been critically examined from cover to cover. No line or word of the testimony has been overlooked; the probative significance of no circumstance, favorable or unfavorable to the one side or the other of the controversy, has been passed unheeded; nor have the arguments contained in the briefs of counsel for the respective parties been denied scrupulous examination and consideration. After all this, the case, upon the facts, to our minds, still involves a mystery not satisfactorily solved by the evidence before us. ▇ We are still under serious doubt with respect to the question whether Miss Beers took the poison with the purpose or intention of causing her death. What is the duty of a reviewing court in such a situation? The answer must be, as it is in other language given above, that it was for the jury, and not for this or any court of appeal, to solve the mystery enshrouding that issue—that is, to determine the question whether the taking of the poison by Miss Beers was by mistake or with the deliberate design on her part to destroy her life.

▇ It must be borne in mind that the defendant entered the trial charged with the burden of overthrowing the presumption that the deceased was sane and that her death was not suicidal but from a natural cause. (Code Civ Proc., sec. 1963, subd. 28; *Jenkins* v. *Pacific Mutual Life Ins. Co.,* 131 Cal. 121 [63 Pac. 180]; *Dennis* v. *Union Mutual L. Ins. Co.,* 84 Cal. 572 [24 Pac. 120]; 21 Cor. Jur., sec. 35, p. 95.) It rested upon the defendant to overcome said presumption, or, in other words, to support the

affirmative defense of suicide "by a preponderance of clear and satisfactory evidence, direct or circumstantial." (37 Cor. Jur., sec. 443, p. 640, and cases cited in the footnotes and also the above-named cases.) ▆▆ And whether the defendant introduced sufficient satisfactory proof to overcome that presumption or to sustain that defense was a question to be solved by the jury, with whose conclusion we are not privileged, legally, to interfere, unless the evidence of suicide is upon its face obviously such as to compel us to hold that no other inference but that of intentional self-destruction may reasonably be drawn. Undoubtedly the circumstances specially stressed by the defendant as involving conclusive proof of suicide are, as before we have said, indicative of a designed self-administered death, and it is to be conceded, as likewise has been stated, would afford sufficient support to the conclusion, had such been the result of the jury's deliberations, that the deceased committed suicide. But it is not true that those circumstances are wholly inconsistent with the theory of the plaintiff that the taking of the poison was due to a mistake or an accident. In other words, the evidence disclosing those circumstances or the circumstances themselves are not upon their face so conclusive as in proof of the suicide theory that a reviewing court is compelled to accept them as constituting the correct solution of the problem presented here for decision as against other circumstances which tend to sustain the presumption that the death of Miss Beers was not intentionally self-inflicted and which circumstances the jury presumptively determined did satisfactorily support said presumption, or, in other words, were sufficient in probative force to shatter the attempt of the defendant to overcome the effect thereof. These circumstances or the evidence thereof may here well be recapitulated. The evidence that the basement of the house in which the deceased resided at the time she bought the poison was infested with rats is undisputed. The evidence that she was constantly in a state of fear of the rodents stands undisputed. The testimony of the druggist who waited on her when she purchased the poison, that he had known her quite well for six or seven months prior to the date of that purchase, that when she applied for the purchase of the poison she was apparently the happy and contented

458

young woman that she had always appeared to be and as she was described at the trial by her relatives and intimate acquaintances and that she betrayed absolutely no inner griefs or sorrows or agitation of mind of any character, also stands in the record without contradiction. The testimony of the same witness that the deceased had, in a number of instances prior to her procurement of the poison, directed small purchases of other articles made by her at the drug-store to be charged to her personal account also stands unchallenged and uncontradicted in the record. Undisputed also is the testimony of Mrs. Miller that the deceased always had sufficient money to pay for any articles she might need or thought she required. If her purpose in buying the poison was self-destruction, it is highly probable, so the jury could well have concluded and it may be assumed did conclude, that she would have paid for the article and thus have pursued a course which would have aided her materially in warding off knowledge by her sister and brother-in-law of her purchase of the poison. Again, and more important than any other consideration, taken alone, is the question of motive. The deceased, between the age of nineteen and twenty years, physically in robust health and attractive, morally clean, with no demoralizing habits, her whole being radiant with the sunshine of the ineffable joys of youth, popular among her acquaintances, possessed of an ample supply of wearing apparel, thus gratifying in full measure the vanity pardonably existent in the majority of her sex, the possessor in her own right of some financial means, enthusiastically ambitious to acquire that proficiency in an art or profession which would enhance her earning capacity or ability and at the same time enlarge the scope of her usefulness in the world's multifarious activities, prior to and up to the very time of her passing, of her own volition and free will, actually prosecuting efforts to accomplish the ends of that ambition, cheerfully buoyant to the day preceding that of her death with optimism and hope regarding the outcome of her efforts to make of herself a stenographer, according to her nearest relatives and intimate acquaintances—those in daily association with her—without any love entanglements or disappointments or jealousies pulling at her heartstrings—in short, a perenially cheerful, healthy, happy,

moral, popular, and attractive girl, with many admiring friends and devoted and loving relatives, surrounded by a happy home life and within her grasp material luxuries which even those better circumstanced financially might envy—there can be suggested no substantial or sound reason why Miss Beers should have desired to have terminated her life by her own deliberate act, while, on the other hand, there appears to have been every reason why she should have desired to live. In addition to the foregoing considerations, we have the uncontradicted testimony of Magill that, after the party had partaken of a meal at the tamale parlor and were riding about the city, the deceased stated that she desired to return to her home and retire for the reason that she was compelled to arise early the following morning for the purpose of studying her lessons before going to school. There is also the testimony of the deceased's brother-in-law, Ed Miller, to the effect that just before she left the house to attend the theater, Miss Beers requested him to call her the following morning before he departed for his ranch, to which he was accustomed to going early each morning, as she was required to arise early and devote some time to her school work before going to school, and, further, the testimony of Miss Faulkner and the Millers regarding the contemplated visit, at the end of the school term, by Miss Beers, the witness and Mrs. Miller to the "Engel Mine." and the enthusiastic delight with which the deceased expressed herself the day before her death regarding the prospective visit.

Reverting now to some of the circumstances at least pregnant with suspicion that the death of Miss Beers was suicidal, we may specifically examine a few of them to ascertain whether the jury, in considering them by the light of those circumstances which are indicative of a want of intention to commit suicide, could not reasonably have found, and it may be assumed did find, that they were not inconsistent with the theory that the death of the deceased was the result of an accident or mistake. The first of these circumstances which may be considered is the fact that the deceased, after calling Mrs. Miller to her bedside, several times declared that she felt that she was going to die. This circumstance is emphasized by defend-

ant as justifying the inference that the deceased knowingly took the poison and realized that it would produce her death. But the testimony of Dr. Victors, explaining the effect of strychnine poisoning upon the afferent nerve center and the sensation thus conveyed to the brain, furnished a hypothesis upon which the declaration of deceased that she felt that she was going to die, considered with the other testimony, could as well have been reconciled by the jury with the theory that she did not know or realize that she had taken the deadly drug as with the theory that she knowingly took the poison. The doctor's testimony was: That the effect of strychnine poison upon taking it would be to produce "slight irritability, and, second, an impaired sensitiveness and frequently an impending feeling that something is going to occur and then the onset of spasms." Again, he testified that there would be nothing very uncommon under any circumstances for a person whose system had in some way absorbed strychnine "without knowing that they had strychnine in their system, saying, before the first spasm: 'I feel sick; I feel that I am not going to last very long.' " The fact that deceased, although requesting the immediate presence of her mother and Magill, did not request that a doctor be sent for is also stressed as a circumstance of potent significance as in support of the theory that she took the poison with suicidal intent. This circumstance, while properly to be considered among those pointing to suicide, the jury could have found reasonably coincided with the presumption that the deceased did not intentionally destroy her life. Or, it may be more accurate to say, the jury could have regarded that circumstance, when considered with others tending to support the presumption, as not militating against the conclusion that the taking of the poison was accidental or by mistake. We need not speculate as to what the jury's reasoning was with reference to that circumstance when deliberating upon their verdict. It is clear, though, that they could well have concluded, without stretching their imagination beyond a reasonable conception of the situation as presented by the evidence, that in her agony of mind and body, suffering, as she must have suffered, excruciating physical pain and the mental anguish thereby superinduced, intensified by her belief that she could survive but a brief period of time,

the persons then uppermost in her mind would be her mother and the young man who the evening before her death had been her companion in social diversion and with whom, for a few weeks previously, she had been keeping company, and that the last person who, under the circumstances, she would ask for would be a doctor, from whose professional services, according to her declarations that her death was inevitable and only a few minutes away, she could not hope to derive medical relief. In this connection we may call to mind the fact that Magill testified that he and the deceased were not and had not been "sweethearts," but merely "good friends," and his testimony in that particular was in nowise contradicted.

The fact that she replied in the negative to her sister's question as to whether she had taken a laxative is not inconsistent with the theory that she did not knowingly take the poison. She no doubt told the truth when she made the answer to her sister, but the jury could have consistently believed that, the cause of her illness having been inquired about by the sister she lived with and when she believed she was going to die, she would have told her that she had taken the poison if knowingly she had done so.

It is further argued that the fact that, while in the tamale parlor, and after Boyd and Magill each stated that he would be required within a short time to leave Chico for a few days, the deceased remarked that she, too, was going some place that "you know nothing about," or words to that effect, is, in view of the other circumstances tending to show death by suicide, very strongly indicative of the fact that the deceased then contemplated taking her life. This may be granted and would perhaps be accepted as a reasonable interpretation of the remark had the jury found in favor of the defendant's affirmative defense. But having found against the defendant on that defense, this court must assume that the jury attached to the remark no such significance, but believed that the deceased then had in mind her prospective visit to the "Engel Mine" within a few days or weeks and not any thought of self-destruction. Such conclusion by the jury as to the remark referred to is given some support by the testimony of Joe Magill that when the remarks about leaving Chico were made all the parties, including the deceased, were in excel-

lent humor and very happy and that the entire conversation relative to leaving Chico, as were all their conversations during that evening, was carried on in a jocose manner and cheery spirit.

The foregoing specific consideration of certain facts and circumstances which defendant well argues tend strongly, when considered with certain other facts and circumstances, to sustain its affirmative defense, is not for the purpose of weighing the testimony, but only to confirm the statement in an earlier part of the discussion that some of the facts and circumstances relied upon by the defendant for the proof of the suicide theory are not wholly inconsistent with the theory adopted by the jury that the taking of the poison by the deceased was not with a suicidal intent. These particular facts and circumstances, which are referable to the conduct, the actions and words of the deceased, aside from the circumstances of the taking of the poison, that of the absence of rats from the new house of the Millers, and the fact of the finding of the bottle containing the remaining portion of the poison in the back-yard of the Miller premises, were for the jury to interpret and so ascertain their evidentiary significance—that is, to determine whether, being obviously consistent with the suicide theory, they were, nevertheless, not inconsistent with the position of the plaintiff that the taking of the poison was by a mistake. The finding implied from the verdict that these particular circumstances were not inconsistent with the theory that deceased took the poison by mistake is, as above declared, a logical deduction.

So the case, as it was submitted to the jury, appears to have developed substantial conflicting evidentiary considerations directly affecting the issue which they were called upon to decide, to wit: On the one hand, circumstances tending to sustain the suicidal theory, while on the other, facts and circumstances tending to negative or explode that theory. The two sets of circumstances stand in resistance to each other, and, as the situation thus presented must be viewed by this court, substantially equal in probative force. Of exceptional importance, therefore, in the determination by the jury of the question whether the affirmative defense of suicide has been sustained by the defendant, and even of greater importance in the disposi-

tion of this appeal by this court, was and is the fact that there was an entire absence of motive in the deceased for purposely or intentionally taking her life. As is true in its application to the proof of the commission of crimes, particularly in the proof of the crime of murder, the rule is that, while the proof of motive is not indispensable, yet the presence or absence of motive is a circumstance going to the question of the quality of the act under inquiry. (8 Cal. Jur., p. 35, sec. 152.) Counsel, however, contend that it fairly appears from the testimony of the witness Miller that the deceased became discouraged and despondent over her failure to make satisfactory progress in her work in school. Miller, it will be remembered, said' that, while in school and engaged in her studies, Miss Beers, appeared to be a person of moods; that, while cheerful on occasion, she appeared at other times to have on her mind something that seriously bothered her. The significance ·of that circumstance, if any of importance it had in the one direction or the other, was like that of all the other circumstances, for the jury to determine—that is, it was for the jury to interpret the circumstance as best they could and so ascertain what was the cause of her "moods," or whether her actions in that respect had any bearing upon the question whether she took the poison knowingly and with the intent thus to end her life. It may be suggested, however, that it would, indeed, be surprising if the young woman had not now and then exhibited seriousness of thought while attempting to acquire, under the disadvantageous circumstances which have been explained, sufficient familiarity with an art, itself difficult for a person of education to master, to enable her to put it to practical use. But, it may be taken as true that the verdict implies, among other things, that the deceased was not discouraged or despondent over the slow progress she was making in her studies, or discouraged or despondent for any reason, on the day before the morning of her death, or at any other time prior thereto, and such finding is amply supported by the testimony of her relatives and intimate acquaintances as to her personal' characteristics, her disposition, the life she led, etc., and notably by the testimony of her teacher, Mrs. Kelly, to the effect that the young woman always during her school experience displayed

a "sunny" disposition and likewise appeared to be happy, that she was making a creditable showing in her effort to overcome her deficiency in grammar, and that, on the day immediately preceding her death, having been asked by the witness how she thought she was progressing with her studies and whether she was happy, replied that she was getting along "fast" in her school work and "was never so happy' in her life."

We have now given an extended consideration, in more or less detail, of the facts and circumstances of this case, not with the view of passing judgment upon the weight or evidentiary value thereof in their bearing upon the single issue involved in the controversy, but solely for the purpose of showing that the situation presented by the record as to the evidence is of a character which forbids an appeal court from justly declaring, as a matter of law, that the defendant succeeded in overcoming the presumption that the death of the deceased was not purposely self-inflicted.

In this connection, it may be observed that a presumption is evidence (Code Civ. Proc., secs. 1957–1961), and that, while as against a proved fact, or a fact admitted, a disputable presumption has no weight, yet, where it is sought to prove the fact against the presumption, it still remains with the jury to say whether or not the fact has been proved; and if they are not satisfied with the proof offered in impeachment of the presumption, they are then at liberty to accept the evidence of the presumption. (*People* v. *Milner*, 122 Cal. 171, 179 [54 Pac. 833]; *Ruth* v. *Krone*, 10 Cal. App. 770 [103 Pac. 960]; Code Civ. Proc., secs. 1961 and 2061, subd. 2.) Although it has been well said that disputable presumptions "while evidence, are evidence the weakest and least satisfactory" (*Savings & Loan Soc.* v. *Burnett*, 106 Cal. 514, 529 [39 Pac. 922]), it is nevertheless the rule that such presumptions *are* evidence which will stand for the facts they represent until, in the minds of the jury, they are overcome or dispelled by clear and satisfactory evidence.

It will also be kept in mind that the defense of suicide in a case of this character is an affirmative one which is set up to destroy the presumption that the death of the party occurred according to the ordinary course of nature, or, as in the present case, was occasioned by the taking

of the poison by the deceased under a mistake or by accident, and, as stated, that defense, to destroy the evidentiary force of such presumption, must be supported by a preponderance of the evidence. In the case of *Savings Loan Assn.* v. *Burnett, supra,* the evidence both for the plaintiff and the defendant was all one way and against the presumption—indeed, as the court said in that case, the whole evidence was such as that it amounted to an admission of the fact against which the presumption was attempted to be invoked. The evidence here upon the question whether the death of Miss Beers was suicidal is manifestly conflicting. There was no admission by the deceased that she took the poison with suicidal intent.

There are certain exceptions which defendant urges to rulings bearing upon the question of the legal propriety of certain testimony and certain questions propounded to certain witnesses. We have carefully examined those assignments and thus have assured ourselves that, even if some of the rulings upon which those assignments are founded were erroneous, the defendant suffered no prejudice therefrom. ■ It may be said, however, that the assignment under the present head particularly stressed by the defendant is that the court refused to allow its counsel to refresh the memory of Joe Magill, when testifying as a witness called by the defendant, from the transcript of his testimony given at the coroner's inquest into the cause of the death of the deceased. In one instance the court did stall an attempt by defendant's counsel to examine the witness Magill in the manner explained, basing its action in that particular upon the theory that such examination involved an attempt on the part of counsel to impeach their own witness. The ground of the ruling was not tenable. It is elementary that a witness may, for the purpose of refreshing his memory, resort to testimony previously given by him regarding a particular matter under inquiry in a subsequent proceeding or trial involving the same issue and of which testimony a memorandum had been made. (Greenleaf on Evidence, 13th ed., sec. 436.) It has been held that the testimony of a witness given at a preliminary examination of an accused in a criminal case may be used by him at the trial of the case to refresh his memory. (*People* v. *Durant*, 116 Cal. 179, 213, 214 [48

Pac. 75].) But an examination of the transcript (see pages 171, 172, and 176 to and including page 178) will show, as thus we have learned, that both counsel for defendant and those of the plaintiff, in questioning Magill, with marked detail went into the matters occurring with Magill, Boyd, Mrs. Hill, and deceased, while they were together the evening and night previous to the death of Miss Beers, thus bringing out all that the deceased did and said which could by any possibility throw any light on her attitude of mind or any conduct on her part which might expose or tend to expose the specific thoughts then running through or weighing upon her mind, if mentally she was disturbed. Besides, on several occasions other than the one above referred to, counsel for the defendant did refresh Magill's memory from the transcript of his testimony given before the coroner and thus brought out the important facts as the witness stated them to that officer. As in effect suggested, the other assignments under this head do not merit special notice herein. Assuming that they involved erroneous rulings, the effect thereof was harmless.

 Complaint is made that the court erred in its refusal to give instruction No. 6, proffered by the defendant. The instruction, if given, would have told the jury that each juror was entitled to make up his or her own mind, without regard to the judgment or opinion of the other jurors, regarding the weight and effect of the evidence, that if any juror reached the conviction from a consideration of the evidence that Nellie Beers committed suicide, no such juror "can conscientiously compromise or surrender his or her conviction in order to reach a verdict or to please other jurors, *nor allow that belief to be influenced in the slightest degree by pity or sympathy.*"

In its charge the court did instruct the jury that each individual juror had the right to form his or her own opinion, or form his or her own verdict. (See Trans., p. 275.) The instruction, it is true, contained the qualification that the jurors should consult "harmoniously together as intelligent men and women and try to get together upon a verdict; and if any of you have made up your mind to a verdict and you are persuaded by the arguments of or consultations with the other jurors that you were wrong, you have a right and should change, if you can do so without

shocking your conscience in regard to it—that is, if you are fully convinced that you are wrong, don't hesitate to change your verdict.'' It is obvious that the qualification (which was not improper) withdrew no force from the initial part of the instruction declaring that each juror was entitled to ''form your own opinion and form his or her own verdict.'' The instruction at the most states mere commonplaces. Every intelligent man and woman must know that each juror of the panel trying a case is entitled to form his own conclusion regarding the weight and effect of the evidence, and that he or she is not compelled to yield any conviction to which he or she has been persuaded after a full and fair consideration of the evidence merely because other jurors have reached an opposite or contrary conclusion. The part of such instruction italicized herein was given by the court in another instruction.

 It is further objected that error was involved in giving the following instruction:

''I instruct you that you are not bound to decide in conformity with the declarations of a witness or any number of witnesses which do not produce conviction in your minds against a less number or any number or against a presumption or other evidence satisfying your minds. A presumption is regarded as evidence and it is for you to weigh and determine what all the evidence offered is worth and where the truth lies. It is for you to determine if you believe under the evidence and these instructions, a presumption exists in favor or against an issue involved in the case, whether or not such presumption outweighs positive or other testimony or evidence against it, and if you are convinced that such presumption outweighs and overcomes the other testimony and evidence, you have the right to decide in conformity with such presumption.''

The ground of the objection to the above instruction is, not that it does not abstractly state a sound rule of law, but because, as is the claim, there is no conflict in the evidence, that the evidence is all one way and supports the suicide theory, and that, consequently, the instruction is inapplicable. We have heretofore expressed the view that there is a conflict in the evidence upon a single question involved in the case. The circumstances and facts tending

to support the presumption that deceased's death was not intentionally self-inflicted, and hereinabove given consideration, are in direct conflict with the facts and circumstances tending to show that Miss Beers committed suicide. In fact, the true situation, legally, is that the verdict necessarily implies that the jury did not regard the evidence presented by the defendant to show that Miss Beers committed suicide as being of sufficient force to overthrow the presumption referred to, said presumption, as we have seen, standing for the facts it represents until overcome by clear and satisfactory evidence—that is, clear and satisfactory to the jury.

■ Two other of the given instructions are criticised as not being pertinent to the case as made by the evidence, viz.: 1. "That a presumption is a deduction which the law expressly directs to be made from particular facts," and that "there is a presumption of law that things have happened according to the ordinary course of nature and the ordinary habits of life," which presumption is disputable "and may be controverted by other evidence, direct or indirect"; 2. That "in this class of cases the rule is that every reasonable hypothesis for accounting for death other than by suicide should be excluded from the case before you can conclude that it was suicide, and then, only, of course, from evidence warranting that conclusion." These instructions state the law correctly and were pertinent to the evidentiary features of the case.

There are no other points requiring notice herein.

The judgment is affirmed.

Plummer, J., and Weyand, J., *pro tem.*, concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 6, 1928.

All the Justices concurred.