[Civ. No. 5281. Third Appellate District.—May 6, 1935.]

EDNA C. HACKLEY, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Devlin & Devlin & Diepenbrock and Horace B. Wulff for Appellant.

Sheridan Downey, Clifton Hildebrand, Werner, Martin & Hildebrand, Louis E. Goodman and Louis H. Brownstone for Respondent.

PLUMMER, J.—This appeal is by the defendant from a judgment obtained in an action prosecuted by the plaintiff under the provisions of the Federal Employers' Liability Act, to recover damages on account of the death of the husband of the plaintiff, alleged to have been caused by the negligence of the defendant. The plaintiff's intestate came to his death by falling from the rear platform of the last car of train No. 22, on the morning of the 18th of February, 1932. The train in question was being operated on the lines of the Southern Pacific Railway Company running from Oakland, California, to Ogden, Utah, by way of Sacramento, California, and Reno, Nevada. The accident, by means of which the plaintiff's intestate met his death, occurred on the line of the railway operated by the defendant a short distance west of the town of Reno. There were no eye-witnesses to the accident, and the judgment of the trial court appears to have been based upon the circumstantial testimony and the inferences drawn from the circumstances and conditions surrounding the incident which led to the death of Lewis R. Hackley.

The rear platform of the car from which the decedent fell was situate on a private or business car used by W. L. Hack, the superintendent of the Sacramento division of the Southern Pacific Company. This car was attached to the rear of train No. 22 at Sacramento in order to permit the superintendent to make an inspection of the roadbed from Sacramento to the end of the Sacramento division, which terminated at a point about 5.8 miles west of Reno. The rear platform of this car has a metal railing entirely around it. The sides of the platform were equipped with steps over which there was, and is the usual car floortraps and the usual metal gates, so that when the traps are down and the gates are closed, the rear platform is entirely surrounded by protecting gates and metal railing, and when the traps are down the entire platform is usable from gate to gate. The traps are raised, and the gates are opened by two separate movements or actions. When the trap is raised it is fastened, by a ratchet, to the end of the car, and then the gate swings back against the raised trap.

On the morning of February 18, 1932, as was his custom, Lewis R. Hackley, who had for many years been a brakeman employed by the defendant, and then was employed in that capacity on train No. 22, went to the rear platform of the

superintendent's car for the purpose of opening a stop valve in order to allow steam to escape from the heat line on the train. This appears to be for the purpose of allowing moisture to be blown therefrom in order to prevent condensation in the line, and freezing, as the train proceeds at such high altitudes. After opening the valve and allowing the steam to escape, Hackley disappeared. After opening the valve, it was the practice of the brakeman to step to the opposite side of the platform, and by means of a signal cord, signal the engineer as to the fact of the valve having been opened. This action required Hackley to step to that portion of the rear platform, where the trap-door was subsequently found open, the theory of the plaintiff being that after opening the valve, which is slightly to the opposite side of the center of the platform, Hackley stepped over to reach the signal cord and signal the engineer, and instead of succeeding in doing so, dropped through the open trap-door and fell to his death.

The record shows that at the time of the incident which we have mentioned, the superintendent was sitting in the rear of the car, saw Hackley go through the rear door carrying a white lantern, and thereupon Mr. Hack left the car in which he had been sitting, stepped to another portion of the car to obtain an overcoat, and upon returning noticed that the rear platform was enveloped in steam, and upon going to the door, observed that Hackley had disappeared. Mr. Hack then gave a stop signal to the engineer who, apparently thinking that it was the signal that should have been given by Mr. Hackley, paid no attention thereto, whereupon Mr. Hack applied the air-brakes and stopped the train. The train was backed up some distance, and Mr. Hackley's dead body was found lying on the ground. The accident occurred at approximately 5:50 A. M.

As we read the record we think the trial court was justified in concluding that after the train left Truckee, no person other than Hackley went out upon the rear platform, and that Hackley went out on the rear platform of the rear car only once, and that was at the time when he met his death.

While there does not appear to be any testimony in the record that either trap or gate of the rear platform was opened after the train left Truckee, it does appear that one of the traps and one of the gates was opened while the train was standing at Truckee, one of the stations on the main line. The testimony of Mr. Hack is to the effect that upon reaching

Truckee a conductor of the line operated by the company from Truckee to Tahoe City came into the car to give Mr. Hack some information relative to snow conditions on the Tahoe line. While this conference was being had, one of the cars on train No. 22 was cut out and switched from the main line to a siding called the "house track". The language of the witness is as follows: "The Tahoe engine came against us on the rear end and took off the car 'Sacramento', ('Sacramento' is the name of the business car used by superintendent Hack), and some other cars, and set a car out on the 'house track', and came back again against the train on the main line. At sometime between the time the Tahoe engine coupled on, and the switching movement was completed, Joe Roderick came in and I discussed with Joe the snow conditions on the Tahoe branch. We talked about rotaries and flangers and other things that railroad men talk about. I think when we got back on the train Joe was still in the car, if I remember right. After we got about ready to go . . . Roderick got off. Hackley was at the rear platform on the ground. When the steam valve was opened on the rear end of the car 'Sacramento', the steam didn't immediately come through, and I said to Hackley, 'Don't start the train until the steam comes through this car'. That happened at Truckee, . . . and when the steam came through we were ready to go. . . . Q. Well, now, was the trap-door open at that time? A. I can't answer whether it was right at that time or not; I don't know whether I closed it or not, but Hackley was on the ground. Q. I understand. And where was Mr. Roderick? A. He was off the car then, standing on the ground. Q. Was that just before you pulled out from Truckee towards Reno? A. Yes, sure it was; . . . whether Roderick was walked away or not, I don't know. Q. Did you close the trap-door and the gate? A. You didn't ask me that question. Q. Yes, I did. A. No, you asked me how he could close the steam from the ground, and I said he did. Q. All right, I am asking you. A. All right. Now, after Mr. Brakeman gets through and the steam comes through, whether he went up ahead, or right or left side facing west, I don't know, I couldn't— Q. Now, wait a minute, I will get down to that. I am trying to show you he didn't get on the platform and go through the car. Whether he went right or left, I couldn't say, but I went in the car. The trap on the right side, to my knowledge, never had been opened; the trap on the left side was kicked down

to a joining, and the gate was closed by myself. Q. You remember that very distinctly? A. Sure, I do, very distinctly. Q. Anything that occurred at that time to impress it on your mind? A. Only the shock after Hackley fell off, running it through my mind, what happened, because that is what I was out there for, to see the steam came through and everything was all right when we left Truckee. Q. Was Hackley there when you closed the trap-door and the gate? A. He was there at the rear. He started up one side or the other. Q. Was Roderick there? A. I can't say that; whether Joe walked off or was standing there, I couldn't say, because my conversation was with Hackley. Q. Do you mean to say you have made no inquiry of Roderick as to whether he saw you close that gate? A. No, sir, none at all; never have spoken to Mr. Roderick about this occasion since the night we discussed the snow conditions on the branch. Q. Now, Mr. Hack, what was your customary practice about closing that gate and trap-door under similar conditions? A. When I am back in the car alone at night? Q. Yes. A. I always close it, Mr. Downey. Q. You never leave it open? A. No, I don't leave it open, I close it.''

■ In connection with the testimony which we have just quoted and its bearing upon its accuracy or credibility as to whether either one of the traps or gates on the rear platform of the superintendent's car was left open by Mr. Hack, we may call attention to an alleged statement made by Mr. Hack to the plaintiff and a witness by the name of Essex, in which Mr. Hack is alleged to have stated that he left one of the trap-doors open, and which statement Mr. Hack denied any recollection of having made. The testimony of Mr. Essex is as follows: ''Mr. Essex, I will ask you whether or not at that time you heard Mr. Hack say in substance that he supposed Mr. Hackley had fallen out— Mr. Wulff: If your Honor please, I see no reason why this witness should be led. Mr. Downey is reading a statement. This witness, if he knows, he knows. The Court: I think he is giving independent evidence, is he not? I think you better ask him if he had a conversation, and what was said. Mr. Downey: I thought, your Honor, it was our duty to ask if he did hear the statement which Mr. Hack denied that he made, but if your Honor— The Court: But that would make the evidence—you see, that would be impeaching Mr. Hack. You want this as independent evidence? Mr. Downey: Well, opposing coun-

sel does, and that is satisfactory to us. Mr. Downey: Now, will you tell us what, if anything, was said by Mr. Hack in reference to the trap-door being opened . . . ? Mr. Essex: . . . I understood Mr. Hack to say it was open so that he could get off at Reno to obtain a paper, a morning paper.''

The plaintiff's testimony is in substance to the same effect, only differing in that the plaintiff testified that they went to the office of Mr. Hack in Sacramento. Notwithstanding that this interview took place a number of weeks after the death of Mr. Hackley, it is contended by the respondent that Mr. Hack's statement to the plaintiff and Mr. Essex may be considered by this court as an admission of negligence on his part, fixing liability upon the defendant. This position taken by the respondent we think erroneous. While there are cases supporting the declaration that the admission of an agent may be considered in fixing liability upon a principal, those cases, however, disclose that the admission held as charging the principal's liability must have been made in the course of the business or transaction, out of, and as a part of the transaction upon which the action is based. We quote from section 733 of volume 2, page 716, Fletcher's Cyclopedia of Corporations, as follows: ''Declarations or admissions of an officer or agent of a corporation are not binding upon it, nor admissible in evidence against it for any purpose, unless they were made by the officer or agent in the course of a transaction on behalf of the corporation, and within the scope of his authority, or unless they were expressly authorized by the corporation, or have since been ratified by it. However, the declarations of an officer of the corporation, although not admissible as an incident of the litigated act, may be admissible on other grounds if the officer had authority to speak for the corporation. So statements may be admissible to contradict a witness although not admissible to bind the corporation. On the other hand, declarations or admissions of officers or agents are admissible in evidence against the corporation for any purpose for which, and under the same circumstances under which, declarations or admissions of a natural person are admissible against him, if they were expressly authorized by the corporation or its authorized officers, or if they have been ratified, or if, although neither expressly authorized nor ratified, they were made by the officer or agent in the course of a transaction on behalf of the corporation, and within the scope of his general authority. 'While corporations can only speak

through agents, nevertheless, the corporation is bound by the declaration of an agent precisely as a natural person would be bound, that is, by the declaration of its agent made while acting within the scope of the agent's authority to act and as a part of some authorized transaction with third persons.' ''

The rule just stated relative to declarations and admissions is supported by an overwhelming list of authorities in footnotes accompanying the text which we have just quoted.   In the instant case, assuming that the declarations and admissions relative to leaving the trap-door open, were made by Mr. Hack, just as testified to by the plaintiff and Mr. Essex, such declarations cannot be considered as admissions of the defendant, or as fixing any liability upon the defendant.   The testimony of the plaintiff and also of Mr. Essex, may be considered, however, and were proper to be considered by the trial court as impeachment testimony affecting the statement of Mr. Hack that he closed the gate and trap-door on the rear platform, after his admission that the same had been opened at the town of Truckee.

█ Rule 851 governing the conduct of train employees is to the effect that trap-doors and gates shall always be kept closed while the train is in motion, and as a protection to passengers, we think the appellant's contention is correct that it is the duty of brakemen to see that all traps and doors are closed while the train is in motion.   The business car attached to the rear of train No. 22 on February 18, 1932, cannot be considered as a passenger car.   It was attached thereto for the purpose of enabling the superintendent to inspect the line of railway by means of floodlights affixed to the rear of the car.

So far as the record discloses, Hackley's mission in coming through the car was for the purpose of opening the steam line in order that any moisture that had been collected therein might be blown out before the train reached Reno.

The testimony shows that in alighting from the train it was the brakeman's duty and practice to alight from a car in advance of the business car occupied by the superintendent of the division, and when the brakeman came through the car to open the steam line, he carried only a white lantern, and not a red lantern and red flag, which constitutes his equipment when alighting from the train when it stops, and acting as a rear guard therefor.   Hackley was not going to the rear end of the business car, as we read the record, for any other

purpose, while he might, when he suspected anything was wrong with the running gear of the car, properly go to the rear therefor for the purpose of making the inspection, there is nothing in the record to indicate that Hackley had any such purpose, from which the trial court we think was justified in concluding that Hackley went there for the single purpose of opening the steam line, allowing the moisture to be blown therefrom, and then to step to the opposite side of the platform, and by means of the signal line convey to the engineer that he had attended to such duty.

Hack's admission, as we have stated, could only be considered by the trial court as affecting the accuracy and credibility of his testimony, and could be considered by the trial court for the purpose of determining whether Hack's testimony that he had closed the gate and the trap was a correct statement of the facts.

Assuming, for the purpose of argument, that the trap-door was left open by Mr. Hack, the appellant contends that Hackley, as the rear brakeman on train No. 22, assumed the risk thereof, and that it was his duty to ascertain the condition of the trap and door, and that if he fell through the same without discovering the condition in which they were subsequently found, he alone was and is responsible. As we have said, the rule requiring the keeping of traps and doors closed was a rule having for its purpose the protection of passengers. Mr. Hack was traveling in a business car for a business purpose as the superintendent of the Sacramento division. The contention of the appellant that he was a passenger we think untenable.

Section 51 of the Employers' Liability Act (U. S. C. A. 45, p. 92), after specifying who may maintain actions on account of injury or death of an employee, reads: "for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track and roadbed, works, boats, wharves, or other equipment".

We think the circumstances in this case which we have set forth show that there was no assumption of risk on the part of Hackley as to the condition of the trap-door and gate on the rear of the superintendent's car. As bearing upon the question of assumption of risk and showing that it does not apply we quote from the case of *San Pedro, L. A. & S. L. Ry.*

*Co.* v. *Brown,* 258 Fed. 806 [8 A. L. R. 865]. (We qoute from page 869 of A. L. R., *supra*) : "Clearly under the act, the defense of assumption of risk is open to the carrier, except in actions brought under Sec. 4, which provides that, in an action for damages for injury to an employee, 'such employee shall not be held to have assumed the risk of his employment in any case where the violation of such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee'. (*Seaboard Air Line R. Co.* v. *Horton,* 233 U. S. 492 [34 Sup. Ct. 635, 58 L. Ed. 1062, Ann. Cas. 1915B, 475, L. R. A. 1915C, 1, 8 N. C. C. A. 834].) But Brown was not injured by reason of any defect in the machinery or by reason of any danger normally or necessarily incident to the occupation of inspecting cars. The accident would not have happened at all but for the negligence of a fellow servant; and as to employers, while engaged in interstate commerce, the servant so engaged does not agree, as between himself and the carrier, to assume the risk of the negligence of his fellow servant. (*Watson* v. *St. Louis, I. M. & S. R. Co.,* (C. C.) 169 Fed. 950.) In *Boldt* v. *Pennsylvania R. Co.,* 245 U. S. 441 [62 L. Ed. 385, 38 Sup. Ct. 139], the court affirmed the action of the trial court in refusing to charge that 'the risk the employee now assumes, since the passage of the Federal Employers' Liability Act, is the ordinary dangers incident to his employment, which does not now include the assumption of risk incident to the negligence of the carrier's officers, agents, or employees.' " See, also, *Baltimore & Ohio S. W. R. Co.* v. *Carroll,* 280 U. S. 491 [50 Sup. Ct. 182, 74 L. Ed. 566] ; *Alpha Steamship Corp.* v. *Cain,* 281 U. S. 642 [50 Sup. Ct. 443, 74 L. Ed. 1086]. We also quote from the syllabus in the case of *Reed* v. *Director General of Railroads,* 258 U. S. 92 [42 Sup. Ct. 191, 66 L. Ed. 480], as follows: "The doctrine of assumption of risk, though not wholly abolished by the Federal Employers' Liability Act, has no application where the negligence of a fellow servant, which the injured party could not have foreseen or expected, is the sole, direct, and immediate cause of the injury."

■■■ Section 53 of the Federal Employers' Liability Act reads in part as follows: "Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such em-

ployee.'' Following the language of this section it has been held that where there is no direct evidence as to how the accident occurred, it will be presumed that the deceased exercised ordinary care. (*Burtch* v. *Wabash Ry. Co.*, (Mo. Sup.) 236 S. W. 338; *Perrin* v. *Union Pacific Ry. Co.*, 59 Utah, 1 [201 Pac. 405].) And further, it will not be presumed that the deceased employee was negligent, or knowingly incurred the risk or injury causing his death. (*Mappin* v. *Atchison, T. & S. F. Ry. Co.*, 198 Cal. 733 [247 Pac. 911, 49 A. L. R. 1330], *certiorari* to the U. S. Supreme Court denied. (273 U. S. 729 [47 Sup. Ct. 239, 71 L. Ed. 862].) Contributory negligence under the Federal Employers' Liability Act does not constitute a defense. (*Hines, Director General of Railroads,* v. *Sweeney,* 28 Wyo. 57 [201 Pac. 165].)

We do not need to cite authorities to the effect that direct proof is not required to show a negligent act which leads to an employee's death. If such negligent act is established by circumstantial evidence, and if the circumstantial evidence justifies an inference of a negligent act upon an officer or another employee of the company, the finding of the court or jury will not be disturbed. We will, however, call attention to the following cases: *Line* v. *Erie Ry. Co.*, 62 Fed. (2d) 657; *Mulligan* v. *Atlantic Coastline Ry. Co.*, 104 S. C. 173 [88 S. E. 445]; *Hurley* v. *Illinois Central R. R. Co.*, 133 Minn. 101 [157 N. W. 1005].

Inferences and presumptions which may be drawn from circumstances surrounding any event under consideration are not necessarily destroyed by opposing testimony, but remain to be considered by the trial court and jury in reaching a conclusion. This court, in the case of *Beers* v. *California State Life Ins. Co.*, 87 Cal. App. 440 [262 Pac. 380], in an opinion written by Mr. Justice Hart, considered very fully the subject of presumptions and inferences, and the fact that they remain in the case for consideration by the trial court, as well as testimony which may tend to overcome either an inference or a presumption. Other cases might be cited supporting the same rule as set forth in the Beers case, *supra,* but to do so would only unnecessarily lengthen this opinion.

The appellant's contention, based upon the testimony of Hack that Hackley, with a lighted lantern, should have seen the open trap if the trap were open, does not appeal to us as convincing. Repeating what we have said before, Hackley went out on the rear platform for a specific purpose.

That purpose was to open a valve to the steam line, and in doing so he had to reach down a short distance to one side from the center of the rear platform to accomplish such purpose. It then became his duty to communicate with the engineer by means of the signal cord. This cord was near the roof of the car, projecting over the platform and to the opposite side of the platform from the location of the steam valve. After opening the steam valve, Hackley's thought as well as his eye and one of his hands were directed to the signal cord, and not to the trap-door, which should have been flush with the platform floor. With this purpose in view, and having in mind the use of the mechanical contrivance for communicating with the engineer, Hackley stepped toward that portion of the platform necessary for him so to do in order to reach the signal cord. He placed one foot at least where the trap-door should have been, and Hackley's time had come. After securing his overcoat, Hack returned to the rear of the car; he observed the platform enveloped in steam. He knew that Hackley had not reentered the car. As a railroad man he immediately sensed danger, stepped out on the rear platform and observed that Hackley was gone. At the same instant he discovered that one of the trap-doors was open. Whether this was a discovery or a realization on the part of Hack we do not need to affirm. The trial court found that the deceased Hackley did not open the trap-door. This finding is amply supported by the inferences which the trial court could properly draw from the circumstances and testimony set forth herein. Hackley did not assume, as we have shown, any additional risks occasioned by the negligence of an officer or other employee of the defendant. That there was such negligence need not be shown by direct testimony. We quote from the syllabus in the case of *Rocha* v. *Payne, Director General of Railroads*, 108 Neb. 246 [187 N. W. 804], as follows: ''Negligence is a question of fact, and may be proved by circumstantial evidence. All that the law requires is, that the facts and circumstances proved, together with the inferences that may be legitimately drawn from them, shall indicate with reasonable certainty the negligent act complained of.''

The facts and circumstances involved in the instant case are readily distinguishable from those involved in the case of *Northwestern Pacific Ry. Co.* v. *Bobo*, 290 U. S. 499 [54 Sup. Ct. 263, 78 L. Ed. 462]. In the Bobo case the deceased had been employed as a bridge-tender at a point called Grand

View on the line of the petitioner's railroad. His duties were to uncouple and couple the tracks, and then mount a short stairway to a room situate in a small house or building on the top of the bridge, for the purpose of operating the mechanism there located, in opening and closing the bridge, and to set the semaphore signals. While engaged in this duty, or while about the bridge, it was alleged that he slipped upon the steps leading to the building at the top of the bridge, and was precipitated into the waters of Petaluma Creek. His body was found floating in the water a short distance from the bridge. There does not appear to be any testimony as to the exact manner in which Bobo was percipitated into the water. The metal steps on the stairway, while apparently smooth, had been used by the deceased for a number of months. At the foot of the stairway, on the edge of an iron platform, was found small pieces of wool and a little spot that looked like blood. During the night-time dew often accumulated on the steps, which of course would cause them to become somewhat slippery. There was no testimony showing any change in the conditions of the mechanism, stairway, railing, or any of the appliances or safeguards with which the deceased Bobo must have been familiar. All of the conditions were held to have been known to Bobo by reason of his months of experience.

While relied upon by the appellant in this case as showing grounds for reversal, the mere recital of the facts involved in the Bobo case reveal the absence of any foundation for inferences or conclusions of negligence. In the present case the conditions and circumstances show a change in the appliances, made without the knowledge of the deceased, and made at a place, and at a time not reasonably to have been anticipated by him. For many months, running into years, the deceased had been accustomed to go upon the rear platform of the rear car and open the steam valve, just as he did in this case, and then step to the opposite side of the platform, resting his body upon the closed trap-door while reaching up and grasping the signal cord in order to communicate with the engineer.

We do not deem it necessary to review other cases cited by the appellant where the facts are similar to those set forth in the Bobo case, and are wanting as a basis from which negligence of the company might be inferred.

If the testimony of the witness Hack be taken at its face value, we think that the doctrine of *res ipsa loquitur* applies. The business car, "Sacramento", was under the con-

trol and management of the superintendent of the Sacramento division of the defendant's railroad. It was not a passenger car, but a business car, intended for, and so far as the record shows, confined to the exclusive use of the superintendent. In the instant case the complaint, just as in the case of *McComas* v. *Al. G. Barnes Shows Co.,* 215 Cal. 685 [12 Pac. (2d) 630], pleaded negligence generally as well as specifically. This lays the foundation for the application of the doctrine which we have just mentioned. We quote from the opinion in the Barnes case, as follows: "It is settled, we think beyond question in this state, that the doctrine of *res ipsa loquitur* applies when negligence is pleaded both generally and specifically (*Roberts* v. *Sierra R. R. Co.,* 14 Cal. App. 180 [111 Pac. 519]; *Bourguignon* v. *Peninsular R. R. Co.,* 40 Cal. App. 689 [181 Pac. 669]; *Burke* v. *Dillingham,* 84 Cal. App. 736 [258 Pac. 627]; *Seney* v. *Pickwick Stages Co.,* 82 Cal. App. 226 [255 Pac. 279])."

The same principle is further elaborated in the case of *Lejeune* v. *General Petroleum Corp.,* 128 Cal. App. 404 [18 Pac. (2d) 429], where the court adopts the language of 1 Sherman & Redfield on Negligence, to wit: "Where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of proper care. (*O'Connor* v. *Mennie,* 169 Cal. 217, 223 [146 Pac. 674]; *Valente* v. *Sierra Ry. Co.,* 151 Cal. 534, 538 [91 Pac. 481]; *McCurrie* v. *Southern Pac. Co.,* 122 Cal. 558, 561 [55 Pac. 324]; *Judson* v. *Giant Powder Co.,* 107 Cal. 549, 556 [40 Pac. 1020, 48 Am. St. Rep. 146, 29 L. R. A. 718]; *Dixon* v. *Pluns,* 98 Cal. 384, 388 [33 Pac. 268, 35 Am. St. Rep. 180, 20 L. R. A. 698].) Of course to justify the application of this doctrine in any case the circumstances of the accident must be such as, unexplained, afford reasonable evidence of want of care in a respect for which the defendant is liable in the particular action . . . One who seeks to recover damages for injuries alleged to have been incurred by reason of another's negligence must establish by a preponderance of the evidence that the latter's negligence has occasioned him loss. However, where the facts are such as to give rise to an inference of negligence from the inherent nature and character of the act causing the injury, or, in other words, to give appli-

cation to the principle of *res ipsa loquitur*, the burden of proceeding is shifted to the defendant, and if he would escape an adverse finding he must adduce evidence to meet the plaintiff's *prima facie* case.''

It is conceded that the mere opening of the trap-door is not in and of itself a dangerous operation.

In addition to what we have said, the accident is shown to have occurred shortly after 5 o'clock on a cold winter morning, and at an hour when full daylight had not yet come.

We may further call attention to the language in the case of *McCloskey* v. *Koplar*, 329 Mo. 527 [46 S. W. (2d) 557, 92 A. L. R. 641], where it is said.: ''And the requirement that the instrumentality be under the management and control of the defendant does not mean, or is not limited to, actual physical control, but refers rather to the right of control at the time the negligence was committed. (45 C. J., sec. 781, p. 1216.) In *Van Horn* v. *Pacific Refining & Roofing Co.*, 27 Cal. App. 105 [148 Pac. 951, 953], an owner who had employed a contractor to install certain machinery in his building agreed to lay and connect steam pipes therewith. He was notified by the contractor to cap a steam pipe located close to where a machine was being put in, and did so, but, while a workman was engaged at his labors near by, the cap blew off and he was scalded. The owner contended the doctrine of *res ipsa loquitur* did not apply because many persons other than his own employees had access to that part of the premises, and some of them might have struck or tampered with the pipe, causing the pipe to loosen. The California case held otherwise, saying: 'The rule . . . to the effect that the exclusive control and management of the appliance causing the injury must be shown to have been in the defendant, must be taken to refer to the right of such control; otherwise, the doctrine of *res ipsa loquitur* could seldom if ever be given application.' This decision is referred to approvingly in a recent California case. (*Wright* v. *Southern Counties Gas Co.*, [1929] 102 Cal. App. 656 [283 Pac. 823, 827].)''

In the case of *Connor* v. *Atchison, T. & S. F. R. R. Co.*, 189 Cal. 1 [207 Pac. 378, 26 A. L. R. 1462], and other cases cited by the appellant where the doctrine of *res ipsa loquitur* was held not to apply, it appears from an inspection that negligence was alleged specifically only, and not generally, and, therefore, such cases are inapplicable.

Finding no cause for reversal, the judgment of the trial court is affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 5, 1935, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 5, 1935.