[Civ. No. 18408.   Second Dist., Div. Three.   May 22, 1952.]

PEARL K. LONG et al., Appellants, v. CALIFORNIA-WESTERN STATES LIFE INSURANCE COMPANY (a Corporation), Respondent.

Renetzky & Davis and Paul M. Davis for Appellants.

A. H. Brazil for Respondent.

WOOD (Parker), J.—Clarence R. Long died on July 7, 1949, as the result of a gunshot wound, and at that time three policies of insurance on his life, which had been issued by the defendant company, were in effect. His wife was the principal beneficiary and his children were alternate beneficiaries under those policies. They commenced this action to recover money which would be payable under said policies if his death resulted from an accident.

One of the policies, issued in 1941, was for $5,000, and provided for double indemnity in the event of death by accidental means. Defendant paid the $5,000 on that policy, and denied liability under the double indemnity provision, contending that the insured committed suicide. Each of the other policies, issued on January 22, 1948, was for $10,000, and provided that: "In case of suicide of the insured . . . within two years from the date of issue . . . the limit of recovery . . . shall be the total amount of the premiums paid, less any indebtedness hereon." The death occurred about 1½ years after those two policies were issued, and defendant denied that any money was payable thereunder except the amount of premiums paid, and it alleged that payment of said amount had been tendered.

The verdict of the jury was in favor of plaintiffs and judgment was entered in accordance therewith. Defendant's motion for a new trial was granted on the ground that the evidence was insufficient to justify the verdict. Plaintiffs appeal from the order granting a new trial.

Appellants contend that the granting of the motion for a new trial was an abuse of discretion. It seems to be their theory that Mr. Long went out of his house in the nighttime to investigate the barking of dogs and that the gun which he was carrying was discharged accidentally when he tripped over a string which was tied to the porch. Respondent

(defendant) contends that the evidence points overwhelmingly to suicide and excludes any reasonable theory that death resulted from accident.

Mr. and Mrs. Long, their two sons (ages 4 and 5), and his two daughters (ages 13 and 15) by a prior marriage, resided on a ranch near Paso Robles. On the evening of July 6, 1949, Mr .and Mrs. Long and their sons had dinner at a restaurant which was about 10 miles from the ranch. The restaurant was operated by their friends, Mr. and Mrs. Gowans. About 1 a. m. Mr. and Mrs. Long and the boys left the restaurant and went home. Mrs. Long, according to her testimony, was driving the automobile on the way home, but Mr. Long wanted to drive and she stopped the automobile and he drove the remainder of the way home. When they returned home the daughters were in bed. Mr. Long went into his bedroom and undressed. Mrs. Long put the boys to bed, and then she went into the bedroom where Mr. Long was. According to her testimony, he was in bed and he asked her how soon she was coming to bed; she told him she was tired and was going to sleep on the couch in the living room; he was angry and they passed a few words; he said that she ''was being a hell of a wife''; she replied that she thought she was a good wife and mother; she went into the living room and went to sleep on the couch; when she awakened she heard Mr. Long talking to her and at the same time she heard the dogs (which were outside) barking; she heard Mr. Long say something about ''not bothering'' her, and he then went outside; about a second later she heard a shot; she ran outside, saw him lying on the grass, and saw a mass of blood; she began screaming for Shag (the hired man); about that time the two daughters came out and one of them ran to Shag's house, about a block away, to get him; decedent (Mr. Long) was lying face down and his hands were under him; she (witness) and Shag turned him over and put him on a blanket; a gun (a German Luger) was in his right hand, and when they turned him over it ''fell off'' and Shag picked it up; at that time she thought decedent had been shot in the right temple. She testified further that she had seen the gun quite a few times; decedent kept it in the top drawer of his dresser with his socks, and she saw it there the day before his death when she put the laundry away. On cross-examination she testified that, in a statement which she made to counsel for defendant in September, 1949, she had said she did not know where decedent

kept the gun, that it seemed he had it in the "pickup" a couple of times, but that they "knew afterwards he must've gotten it out of the stocking drawer"; when she saw the decedent at the funeral parlor she saw the bullet hole, and it was over the left eye and toward the hairline; she had been told that after decedent was shot she said over and over again, "Oh, Busty, why did you do this to me"; she did not recall anything she said or did—"it's like a nightmare."

According to the testimony of Shag, he arrived at the house about 3 a. m.; decedent was lying face down on the lawn with his right hand under his chest; he and Mrs. Long turned decedent over and the gun was in decedent's right hand; he (witness) took the gun by its tip end with two fingers and dropped it to the ground; decedent's face was full of blood; there was a blood clot on decedent's right temple and that is where Shag thought the bullet hole was.

One of decedent's daughters, called as a witness by plaintiffs, testified that she heard her parents after they returned home; she did not hear what her father said but her mother said that she had always been a good wife and mother; their voices were normal and not loud or argumentative; she heard the dogs barking; she heard decedent walk through the kitchen, the living room, and out the front door; a few seconds later she heard a shot, and she heard her mother run out and say, "Busty, why did you do this to me"; she (witness) ran out on the porch; her father was lying on his stomach, he was in his shorts, and his body was a little bit off the porch and parallel with the front of the house; there were four chairs on the porch; the boys always built play houses with them; she noticed that one of the chairs was turned over, and that a string had been tied to the chair and also tied to the porch post which was nearest the front door. She testified further that it was not unusual to hear the dogs bark during the night.

Mr. Gowans, called as a witness by plaintiffs, testified that he arrived at decedent's ranch about 4 a. m. on July 7th and he left about 8 a. m.; after daylight he went on the porch; a chair was lying on the porch with its back practically against a post of the porch; a string—carpenter's chalk line—was tied to the post and to the chair; there were two strings tied to the arms of the chair and to the post; he untied the strings either at the post or at the chair.

Mrs. Long's aunt, called as a witness by plaintiffs, testified that Mrs. Long said to her, "Why did he do it"; about 6:30 a. m. she went outside with Mr. Gowans; she saw the chair which was turned over against the post; there were toys all around the chair.

A doctor, called as a witness by defendant, testified that about 2:30 a. m. on July 7, 1949, he was asked to go to decedent's residence; a Mrs. Ross went with him and showed him the way; when they arrived Mr. Long was dead, and he (witness) made no examination of him; Mrs. Long told him that decedent came through the living room, where she was sleeping, and made a statement which was to the effect that, "Well, you won't be bothered with me any more," and then he went on the front porch and almost immediately she heard the shot.

A deputy sheriff, called as a witness by defendant, testified that he arrived at the ranch on July 7th about 3:45 a. m.; he talked to Mrs. Long and she told him that while she and decedent were at the restaurant they had "a few drinks"— he had more than she had, and they got into an argument on the way home concerning decedent's driving the automobile; she also told him that ordinarily decedent kept a gun in the glove compartment of "the pickup," and when he went outside he said (as she recalled it), "You won't see me again."

Mrs. Ross, a witness called by defendant, testified that when she arrived at the ranch, decedent's body was on the lawn; she heard Mrs. Long tell the deputy sheriff that there had been a slight argument and she had told decedent she was going into the living room to sleep, that he came into the living room, it was dark, he spoke to her, and at first she did not understand what he said, then she heard him say, "Well, I won't bother you any more." She testified further that she and Mr. Gowans walked out in front and picked up some chairs.

Mr. Ross, called as a witness by defendant, testified that he was at the ranch early on the morning of July 7th, and he heard Mrs. Long say that the decedent said, "All right; that's the last time I'll bother you"; Mrs. Long said she thought that decedent meant that he was going back to bed and was not going to bother her any more that evening. He testified further that during the trial (before he testified) he asked Mrs. Long how the case was coming, and she said,

"If you do not damage me too much, I think I'll win it"——
"If you don't remember, I couldn't lose."

A brother of decedent, called as a witness by defendant, testified that he arrived at the ranch about 9:30 a. m. on July 7th; Mrs. Long's first words were, "Oh, why did he ever do it?" and "he had no rhyme or no reason to do a thing like that"; she said they had some kind of an argument coming home from the restaurant about who was going to drive; they continued the argument after they returned home, and she decided to sleep on the davenport; decedent came out and said he was not going to bother her any more, and a minute later she heard a shot.

Another brother of decedent, called as a witness by defendant, testified that he and the last witness went to the ranch together; one of the first statements he remembered Mrs. Long making was that "there was no rhyme or reason for him to do it"; he (witness) asked her if she was sure it was suicide and she said that all the facts pointed to it; he then told her that "her insurance wasn't any good, she couldn't collect on it because there was a two-year clause in the policies."

A firearms expert, called as a witness by plaintiffs, testified to the effect that it would be extremely difficult for a person to get the gun into such a position with his right hand, when his index finger was on the trigger, that he could inflict upon himself a wound similar to the one described herein.

A physicist, called as a witness by defendant, testified that he made numerous tests to determine whether the gun would discharge accidentally from any type of impact or shock, and that in those tests he was unable to cause the gun to discharge.

As above shown, appellants (plaintiffs) contend that the granting of the motion for a new trial was an abuse of discretion. They assert in effect that in view of the presumption in favor of accidental death and against suicide, and in view of the fact that the burden of proving suicide was upon the defendant, and in view of the physical facts showing that decedent did not intentionally take his own life, the evidence was insufficient to support a verdict that the insured committed suicide. ██ Where a violent death has occurred, "the presumption, in the absence of further evidence, is in favor of accidental death and against suicide. . . . This presumption is, however, merely an item in the

evidence, and does not impair the force of the rule that on the whole evidence, including the presumptions, the plaintiff must show . . . that injuries were effected by accidental means." (*Postler* v. *Travelers Ins. Co.*, 173 Cal. 1, 6 [158 P. 1022].) ■ It is clear, as shown by the evidence above referred to, that there was substantial evidence that would have supported a verdict in favor of defendant. ■ In determining the motion for a new trial it was the province of the trial court to consider the credibility of the witnesses and the probative value and force of the evidence. ■ "It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court." (*Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305, 307 [163 P.2d 689].) ■ Upon appeal "from an order granting a new trial, all presumptions favor the order as against the verdict." (*Mazzotta* v. *Los Angeles Ry. Corp.*, 25 Cal. 2d 165, 169 [153 P.2d 338].)

The order granting the motion for a new trial is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied June 11, 1952, and appellants' petition for a hearing by the Supreme Court was denied July 17, 1952.