[L. A. No. 23318. In Bank. Feb. 1, 1955.]

PEARL K. LONG et al., Appellants, v. CALIFORNIA-
WESTERN STATES LIFE INSURANCE COMPANY
(a Corporation), Respondent.

T. R. Claflin, Renetzky & Davis and Paul W. Davis for Appellants.

A. H. Brazil for Respondent.

SPENCE, J.—Clarence R. Long died July 7, 1949, as the result of a gunshot wound. At that time three policies of life insurance issued by defendant company on his life were in effect. One of the policies, issued in 1941, provided for double indemnity in the event of death by accidental means. The other two policies, issued in 1948, had a two-year incontestable clause, and for that period did not insure against self-destruction. Defendant paid the face value of the 1941 policy but refused payment of double indemnity under that policy or any payment under the 1948 policies, except the total amount of the premiums paid thereon, claiming that the deceased had taken his own life. The surviving wife and children, the principal and alternate beneficiaries respectively, commenced this action on the policies, seeking recovery of the money which would be payable if the death resulted from an accident.

Upon the first trial the verdict and judgment were in favor of plaintiffs. Thereafter the trial court granted defendant's motion for a new trial on the ground that the evidence was insufficient to justify the verdict, and this ruling was upheld. (*Long* v. *California-Western States Life Ins. Co.*, 111 Cal. App.2d 254 [244 P.2d 488].) Upon the second trial the verdict and judgment were for defendant, and plaintiffs appeal. As grounds for reversal, plaintiffs contend that the court committed prejudicial error, citing these particular matters: (1) Allowance of the reading of the testimony of Katherine Ross and John Ross given on the former trial; (2) admission in evidence of a threat of suicide made by the deceased three years before his death; (3) exclusion of evidence of prior accidents suffered by deceased in carrying guns; (4) limitation of the cross-examination of defendant's witness, Charles Long; (5) refusal of expert testimony of a ballistics expert; and (6) instructions on the suicide phase of the policies.

Mr. and Mrs. Long, their two sons (ages 4 and 5) and his two daughters (ages 13 and 15) by a prior marriage resided on a ranch near Paso Robles. Mr. Long was a robust man, in good health and prosperous. On the evening of July 6, 1949, Mr. and Mrs. Long and the two boys had dinner at a restaurant with a Mr. Augustus and his son. It was a social occasion, with some moderate drinking, and the Longs departed for home about 1 a. m. The ride home took some 15 to 20 minutes, with Mrs. Long starting to drive and then Mr. Long taking the wheel for the remainder of the way. A quarrel ensued during the drive and continued after they arrived home. The two girls were then in bed. Mr. Long went to his bedroom and undressed. Mrs. Long put the two boys to bed, and then went into the bedroom where Mr. Long was. He wanted her to come to bed with him, but she said that she was tired, that she had to arise at 5:30 o'clock that morning to cook breakfast for the harvest hands, and that she was taking some bedding and was going to sleep on a couch in the living room. Mr. Long became angry, they passed a few words, he accused her of "being a hell of a wife" and she replied that she thought that she was a good wife and mother.

After a short interval Mrs. Long, who had gone to sleep in the living room, was awakened when she heard Mr. Long talking to her in the room and at the same time heard the dogs barking outside. He mumbled something about "not

bothering'' her any more, and that she would not see him again, and then he slammed the door as he went out on the porch. A few seconds later she heard a shot. She ran outside and found Mr. Long outstretched in the front yard, lying parallel to the porch, face downward with his hands under his body. The girls ran for the hired man. Upon arriving at the scene, the hired man helped Mrs. Long turn Mr. Long on his back, and he removed the gun which the deceased was holding in his right hand. Mrs. Long kept repeatedly crying, ''Oh, Busty, why did you do this to me,'' expressing herself in a manner indicating that she believed he had committed suicide and stating that he had ''no rhyme or reason'' for doing so. Two wounds, produced by one bullet, were found in the deceased's head, one in the center of the forehead and one at his right temple.

It was plaintiffs' theory that the deceased had arisen from bed in response to the barking of the dogs, that as he went on the porch to investigate, he stumbled over a chair or tripped on an outstretched string, and in falling the gun which he was carrying was accidentally discharged, with the bullet entering his forehead. Several witnesses testified that after the shooting they found a chair overturned in the vicinity of where the deceased fell and a string tied between the leg of a chair and a porch post near the front door of the house; and there was testimony that one of the little boys had put the string there during play that day. Other witnesses testified that they saw no string.

It was defendant's theory that the deceased intentionally shot himself in the temple as the result of the bedtime quarrel with his wife. It seems to be conceded that the entrance hole caused by a bullet would be smaller than the exit hole. The parties apparently agree that if the wound in the forehead were the smaller, it would mark the point of entry and indicate the death was accidental; but if the contrary were true and the smaller hole was that in the right temple, suicide would be indicated.

A doctor who had seen the deceased's body immediately after death testified that he had made a superficial examination of the deceased, observed the two wounds in the head, noted powder marks or burns appearing in a darkened area around a small opening in the forehead but did not examine the wound in the temple around the right ear. The doctor's examination was made about 3 o'clock in the morning, when it was dark. The mortician, who likewise arrived at the scene

shortly after the deceased's death, testified that upon observing the two bullet holes in the deceased's head, he noticed that the one in the forehead had a darkened area around it, toward the center, and the surrounding tissue was slightly speckled, having the appearance of powder marks or burns. He further stated that his examination was casual, and that he merely glanced at the deceased's body, having determined that it was suicide. Plaintiffs rely on these witnesses to support their theory of the deceased's death through accident.

Two other doctors testified that, with an autopsy surgeon, they had examined the deceased's body when it was exhumed some three and a half years after death, and that it was their opinion that the deceased had shot himself in the temple. They limited their examination to an external observation of the wounds as required by the court order permitting the exhumation of the deceased's body. Both doctors had performed numerous autopsies. They gave the measurements they had made of the two wounds, showing that the forehead wound was considerably larger than the one above the right ear. In further support of their opinion as to the deceased's commission of suicide, they described the bone structure to be noted in distinguishing between an "entrance" or "puncture wound," which will splinter the bone and drive fragments inward, and an "exit" or "explosive wound," where the explosive forces of the bullet and the fluid or solid material behind it are ejected, splintering the bone and driving the fragments outward. According to their notes made at the time of examination, they testified that in the forehead wound a piece of bone appeared to have been driven outward into the subcutaneous tissue, that this wound was beveled outward, the outside being wider than the inside, and there was some bone missing; that the bones at the temporal wound gave the impression of being bent inward; that there were numerous fractures of the skull, a "burst effect"; and that the right temporal region was shattered.

The extent of these doctors' examination was restricted under the court's order but their observations were as thorough as the circumstances would permit, in view of the then decomposed condition of the deceased's body. If the bone structure at the wound in the temple was pressed inward and beveled as described by these doctors, if there was bone missing at the forehead wound, which was the larger, and a piece of bone forced outward, and if the bone there was beveled so that the outer surface was larger than the inner,

the wound in the temple above the right ear was undoubtedly the entry point of the bullet. The parties seem further to agree that it would be virtually impossible for the deceased, a right-handed man, to have intentionally fired a shot into his forehead that would emerge above and in front of the right ear—as the two head wounds were located.

The issue was thus sharply defined for the jury's evaluation of the physical evidence in determining whether the bullet entered the forehead consistent with plaintiffs' theory of accidental death or entered at the temple consistent with defendant's theory of suicide. The jury's verdict for defendant establishes that it rejected plaintiffs' theory and accredited defendant's theory, which was premised on the findings of the two doctors and their "considered opinion" that the temple wound was the entry point and the forehead wound marked the exit of the bullet.

 Other factors in evidence sustain the jury's finding in accord with defendant's suicide theory. When a person trips, the normal movement is to throw out the hands to break the impending fall, and the fingers will be extended. Also, in tripping, the person falls in the direction in which he is traveling. Yet here the deceased's body was found face down with both hands under his chest, and lying not at right angles to, but parallel to, the front porch, which deceased was crossing as he emerged from the house. Furthermore, there was abundant evidence from witnesses for both plaintiffs and defendant that the deceased's last words to Mrs. Long were to the effect that he would not bother her any more and this would be the last time that he would bother her; that when Mrs. Long ran outside after hearing the shot and found the deceased lying in the front yard, she kept repeatedly crying, "Oh, Busty, why did you do this to me" and stating that he had "no rhyme or reason" for doing it. In fact, the record indicates that it was only after Mrs. Long had spoken to two of the deceased's brothers about the terms of the insurance policies that the death was correlated with an accident rather than suicide. The brothers arrived at the deceased's ranch about 9:30 in the morning of July 7. At that time Mrs. Long told them that it looked like the deceased had committed suicide. They thereupon stated that if those were the facts, "her insurance wasn't any good" and referred to the two-year suicide clauses. When Mrs. Long then appeared shocked and asked if they were certain about it, they assured her that they were because of previous

inquiry they had made about the insurance terms. Moreover, the matter was first reported to the local newspaper as a suicide and subsequently the story was changed, allegedly to save the feelings of the family. In the light of this record, plaintiffs' claims of error must be examined.

Plaintiffs' objection to the reading of the testimony of Mr. and Mrs. Ross given at the former trial was overruled. They contend that this ruling was incorrect because there was not a sufficient showing that either Mr. or Mrs. Ross was out of the jurisdiction. (Code Civ. Proc., § 1870, subd. 8.) ■ In construing this section, "out of the jurisdiction" means without the state. (*Meyer* v. *Roth*, 51 Cal. 582, 583; *Gordon* v. *Nichols*, 86 Cal.App.2d 571, 576 [195 P.2d 444].) Defendant's counsel testified that a subpoena for the witnesses had been returned by the constable unserved, and that he had been informed by an attorney in Paso Robles that Mrs. Ross was living in Santa Cruz, California, and Mr. Ross was in The Dalles, Oregon. Upon cross-examination, defendant's counsel admitted that he knew that the Rosses had a daughter living in the Paso Robles area, and stated that he had referred this matter to the constable for investigation, before the subpoena was returned. The court then granted the request of defendant's counsel for permission to read the testimony in question, and plaintiffs' counsel stated: "Well, go ahead as to Katherine Ross. May I make an objection as to the testimony of Mr. Ross outside the presence of the jury, Your Honor?"

Whether this amounted to a waiver of objection to Mrs. Ross' testimony or, as plaintiffs claim, was merely a suggested sequence for the reading of the testimony need not be decided. ■ Granting that Mrs. Ross was not shown to have been "out of the jurisdiction" or unable to testify in person, it does not appear that the allowance of her testimony from the former trial worked any prejudice to plaintiffs' case. Her testimony was in the main cumulative: that she was called to the Long residence the morning of Mr. Long's death; that she did not remember discussing with Mrs. Long anything about string tied to the chair; and that Mrs. Long briefly reviewed the night's happenings, including her "slight argument" with Mr. Long on the way home; her going into the living room to sleep; Mr. Long's entry into the room and saying that he would not bother her any more, by which Mrs. Long thought that he meant that he was going back to bed. ■ Mrs. Ross also testified that after a discussion with

Mrs. Long, who appeared to be concerned over the effect the suicide statement in the local newspaper might have on the children and the deceased's mother, she, Mrs. Ross, was able to arrange for the story to be changed so as to report Mr. Long's death as an accident. Plaintiffs argue that from this latter testimony it might be inferred that Mrs. Long was actuated by improper motives in giving a false account of the death. However, earlier in the trial in the examination of Mrs. Long, defendant's counsel elicited from her that on the morning of the death she had discussed with one of the deceased's brothers the suicide clauses in the policies. Mention was then made of her arranging to have the newspaper story ''changed to accident at the outset, so that his parents wouldn't feel badly about it,'' and plaintiffs' counsel stated: ''I have no objection to your going into that.'' After such concession, plaintiffs are in no position to argue a possible unfavorable inference which might be drawn from the similar testimony given by Mrs. Ross.

With respect to the admission of the testimony of Mr. Ross in view of his alleged absence from the state, there was no suggestion that the information of defendant's counsel was unreliable or in any way subject to question. Plaintiffs' main objection now to that testimony stems from the fact that in the former trial, Mr. Ross was not subjected to cross-examination, a circumstance noted in the argument of defendant's counsel to the jury and from which unfavorable inferences might be drawn. Plaintiffs' procedure in the first trial in evaluating any detrimental effect which Mr. Ross' testimony might have in their case and the wisdom of undertaking his cross-examination were matters for plaintiffs' counsel to decide at that time, but they have no bearing on the propriety of admitting that testimony into evidence in the present trial. ■ The sufficiency of the showing of the absence of a witness justifying the admission of his testimony given at a former trial is within the discretion of the trial court, and no abuse thereof appears in the present record. (20 Am.Jur. §§ 705-706, pp. 592-594; *Cameron* v. *Ah Quong,* 175 Cal. 377, 384 [165 P. 961]; *Weaver* v. *Shell Co.,* 34 Cal. App.2d 713, 721 [94 P.2d 364].)

Plaintiffs next contend that it was prejudicial error for the trial court to admit in evidence testimony that three years before his death, the deceased had threatened to commit suicide. On this point the record shows that in cross-examination, Mrs. Long was asked whether after the funeral she

had not told Mr. Long's sister that Mr. Long said that he was going to kill himself. Mrs. Long denied this and added that she did not remember Mr. Long "ever saying that he was going to kill himself." The court then asked: "You say you never heard your husband ever say he was going to commit suicide at any time?" and she answered: "I never did." Questioned further whether Mr. Long had threatened suicide some three years previously, Mrs. Long recounted an incident when Mr. Long had traded an automobile for · an army ambulance, a transaction which she considered a poor business deal and caused her to cry. The court questioned: "Well, did he say anything about committing suicide then?" and she replied, "No." Plaintiffs made no objection to these queries as improper cross-examination.

Throughout her testimony Mrs. Long was attempting to establish that she and Mr. Long were a happy married couple at all times; that there had been no serious quarrels between them; that Mr. Long was a jovial man; and that he had never threatened to commit suicide. To refute these claims, defendant called George Long, decedent's brother, who gave the following testimony over plaintiffs' objection: In 1946, late one night, he went to the deceased's home after a party. As he approached the door, it opened and the deceased came out of the house with his wife. They seemed to be having an argument, and the deceased had a revolver in his hand. The deceased was "pretty drunk," and talked of committing suicide. He, the witness, got the gun from the deceased and put him to bed.

■ It may be conceded that if this testimony as to the deceased's threat of suicide, made some three years before death, and under dissimilar conditions, had been offered by defendant as affirmative independent evidence, it should have been rejected as too remote in point of time and too speculative in import by reason of the altered circumstances. (*Jenkin* v. *Pacific etc. Ins. Co.*, 131 Cal. 121, 123 [63 P. 180] ; *Hale* v. *Life Indem. & Inv. Co.*, 65 Minn. 548 [68 N.W. 182, 183].) But as above mentioned, this testimony was offered to rebut the testimony of Mrs. Long, on cross-examination, where she was persisting in her claim of a happy married life with the deceased, unmarred by any serious quarrels. In short, she opened the door to further inquiry after she, in support of her claims of marital happiness with the deceased, positively denied that any previous suicide threat had ever been

made by him. To impeach her statements and to show that she and the deceased at least on one occasion during their married life had a violent quarrel, wherein deceased did threaten suicide, defendant introduced the challenged testimony. Under the circumstances, there appears to be no error in its admission as rebuttal testimony.

■ Nor was it error to exclude evidence of previous accidents of the deceased through his carelessness in handling guns. There were no facts in evidence which indicated that the gun which was found in the deceased's hand at the time of death was discharged as a result of his carelessness in handling it.

Plaintiffs next complain of the limitation of the cross-examination of defendant's witness, Charles Long. On direct examination this witness testified to the effect that after the funeral, he and Mrs. Long had discussed the cause of the deceased's death and they had agreed that it was suicide. Then on cross-examination, plaintiffs sought to prove as part of the same conversation, the fact that this witness had actually expressed a contrary opinion in stating his belief that the deceased had not committed suicide. ■ It is well settled that where part of a conversation is put in evidence, the adverse party is ordinarily entitled to introduce the remainder of the conversation. (Code Civ. Proc., § 1854; 10 Cal.Jur. § 320, p. 1080; 20 Am.Jur. § 275, p. 262; *Risdon* v. *Yates*, 145 Cal. 210, 215 [78 P. 641].) However, it does not appear reasonable to conclude that this error in ruling caused any prejudice to plaintiffs' case.

■ In the course of the examination of the witness Charles Long, it was shown that he lived near Bakersfield, over 100 miles from the scene of deceased's death on a ranch near Paso Robles; that he did not go to the deceased's home following the death but stayed in Bakersfield with his and the deceased's mother; that consequently he never saw the body following the shooting but only at the time of the funeral in Bakersfield; and that it was only late in the afternoon of the funeral that he had occasion to talk to the deceased's wife about the matter. Under these circumstances it is apparent that what he might have had to say as to the cause of death would be pure conjecture. In view of the abundant evidence of physical facts in the record as to the nature of the death and relevant testimony of various persons who visited the premises and observed the surrounding conditions, it does not seem that the jury would be likely to attach any

significance to this witness' opinion. Accordingly, the error in question may not be deemed prejudicial.

 There was no error in the court's refusal of certain expert testimony offered by plaintiffs relative to proof of their theory on the manner of the deceased's death. The challenged ruling concerns a ballistics expert who was questioned whether he had made tests by tripping and falling to determine how he could produce wounds such as those inflicted upon the deceased. Defendant objected, primarily upon the ground that the tests were not conducted on the deceased's ranch, and that they should be made under similar conditions. The objection was sustained upon the court's holding that the matter was not a proper subject of expert testimony. Plaintiff then offered to prove that the witness ". . . conducted 30 to 45 tests of tripping and falling, and that the tests demonstrate that the entrance wound of the bullet would be in the forehead, and the exit wound would be in the temple. . . ."

The court's ruling excluding such testimony was correct. This is not a situation comparable to the opinion of a qualified physician relative to the means which might have been employed to produce a given injury, a subject on which he would have peculiar knowledge by reason of experience and study. (10 Cal.Jur. § 256, p. 997; *People* v. *Sampo*, 17 Cal.App. 135, 150 [118 P. 957].) Experiments which can be made without special knowledge or training and which are largely based upon speculation or conjecture are not properly the subject of expert testimony. (*Cf.* Code Civ. Proc., § 1870, subd. 9.) Moreover, a ballistics expert called by defendant earlier in the case had already testified on cross-examination that conceivably a man holding a pistol might fall so that it would strike the ground butt first and remain pointed toward him; and that the fall would have a tendency to press the finger on the trigger. Thus, it is clear that plaintiffs' theory of the manner of deceased's death was a consideration submitted to the jury, and nothing material along that line could have been developed through plaintiffs' proffered expert testimony.

Finally, there was no error in the instructions to the jury as to the pertinent suicide provisions of the insurance policies, and that if the jury found "by a preponderance of the evidence" and was satisfied from the evidence that the deceased committed suicide, the finding must be for defendant. (See *Wilkinson* v. *Standard Acc. Ins. Co.*, 180 Cal. 252, 255-

257 [180 P. 607].)　▓▓▓　The facts here reviewed—showing that deceased rushed out of the house in the middle of the night clad only in his undershirt and shorts, after declaring to his wife that he would not bother her any more; that immediately thereafter the shot was fired and within a matter of seconds, his wife found him lying motionless in the yard with his hands under his chest and parallel to the porch; and then her repeated cries of why did he do such a thing when there was "no rhyme or reason" for it—make it almost impossible for a reasonable mind to reach any other conclusion than that the deceased committed suicide. (See *Frankel* v. *New York Life Ins. Co.,* 51 F.2d 933, 935; *Burkett* v. *New York Life Ins. Co.,* 56 F.2d 105, 107-108; *Travelers Ins. Co.* v. *Miller,* 62 F.2d 910, 913.)

The appeal was taken also from an order denying plaintiffs' motion to strike the judgment and enter a new judgment and from an order taxing costs. Plaintiffs do not mention these grounds of appeal in their briefs and they will be deemed to have been abandoned.

The judgment and the orders appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.