**Charlotte S. HOUSTON, Plaintiff,**

v.

**The CANADA LIFE ASSURANCE COMPANY et al., Defendants.**

**No. 34395.**

United States District Court
N. D. California, S. D.

Jan. 10, 1956.

584

At the end of the policy is the statement:

"The answers recorded above are as given by me and are complete and true."

In the body of the application the following question and answer appears:

6. a. "Q. To what extent do you use alcoholic stimulants? A. Yes, socially only occasionally.

b. "Q. Have you ever used them to excess? A. No."

■ It is defendant's contention that Mr. Houston, the deceased, habitually used alcoholic stimulants, and at times used them to excess. The defendant bears the burden of proving that Mr. Houston made a material misrepresentation in the application for insurance. Everett v. Standard Acc. Ins. Co., 45 Cal.App. 332, 187 P. 996; Scoles v. Universal Life Ins. Co., 42 Cal. 523; Mickschl v. National Council of Knights & Ladies of Security, 40 Cal.App. 100, 180 P. 27.

■ It is the Court's view that Mr. Houston's answers to the general questions regarding his consumption of alcohol are to be regarded as expressions of insured's opinion and that the questions having been framed by defendant, they are bound by any ambiguity or uncertainty that may arise from the answers. McEwen v. New York Life Ins. Co., 42 Cal.App. 133, 183 P. 373; Mayfield v. Fidelity & Casualty Co., 16 Cal.App.2d 611, 61 P.2d 83.

■ Defendant's evidence concerning the insured's use of alcohol failed to establish any material misrepresentation, and viewing the entire evidence on this point the Court cannot conclude that the insured's use of alcohol was proven to be excessive or unusual so that it can be said that he misrepresented the facts in answering the general questions propounded to him in the application.

Angell & Adams, San Francisco, Cal., for plaintiff.

Keesling & Keesling, Henry C. Clausen, Henry C. Clausen, Jr., San Francisco, Cal., for defendants.

ROCHE, Chief Judge.

The plaintiff seeks to recover on a life insurance policy which is dated November 3, 1953, and the defendant defends on two grounds: 1. The policy is voidable because of misrepresentation of material facts in the application; and 2. because the insured died from a wound which was intentionally self-inflicted with a rifle.[1]

The application dated September 24, 1953 contains the following statements:

"I declare that to the best of my knowledge or belief I am at present in good health, not being afflicted with any disease or disorder * * * except as may be disclosed * * * and that the above statements are complete and true."

---

[1] The application for the insurance was made on September 24, 1953. The death occurred February 22, 1954. Under the policy the company would not be liable in the event death occurred by suicide within the first two years. The company, however, would repay the premiums.

The insured's wife and two daughters, close friends and business associates, including three members of the bar of this Court, who saw him regularly over a period of years, the partner in his Oregon ranch enterprise, and two of his hunting companions all testified that they had never known the insured to be intoxicated or under the influence of alcohol without full possession of all his mental and physical faculties. Defendant's evidence on this point failed to establish by a preponderance of evidence that a misrepresentation had been made.

The other contention made by the defendant is that the insured died by his own hand rather than as the result of an accident. The rule applicable to the defense of "misrepresentation" is also applicable to the defense of "suicide", i. e., the defendant has the burden of establishing its affirmative defense, Beers v. California State Life Ins., 87 Cal.App. 440, 262 P. 380. The defendant claims that the undisputed physical facts indicating suicide are decisive on the question of burden of proof, and that the physical facts are consistent only with the defense of suicide and are not consistent with the theory of accident. The evidence presented at the trial was without dispute, so far as the actual evidence of the manner in which Mr. Houston met his death.

Briefly summarized the evidence was as follows:

On the Friday before Mr. Houston met his death, he put in a full day at his insurance office. He made plans for activities for the coming week which were shown on his calendar by his secretary. He told his secretary he wouldn't stay to dictate a letter to the home office regarding business activities for the coming year of 1954, and would leave it until Tuesday.

On the Saturday preceding his death he attended a function given for his daughter by her sorority. On the following day, Sunday, he went to church, as usual, with his family and spent the afternoon with two business associates making plans for furthering a farming and cattle venture in southern Oregon. That evening Mr. Houston hurried back from the meeting to a dinner with the Hanscoms. Ann Houston, Mr. Houston's younger daughter was engaged to Mr. & Mrs. Hanscom's son, and they were having a regular family get-together.

Later in the evening the Houston family left for home, and retired about 11:30 p. m. Mrs. Houston testified that her husband slept until late in the afternoon, remaining in bed until 1:30 or 2:00 o'clock, until she called. She said that this was usual and customary, and that on holidays and weekends the family often slept late.

She testified that she and Ann, her daughter, got up about 9:00 or 9:30, that they had their breakfast, and they had done things around the house. On towards lunch time Mrs. Houston awakened her husband and asked him if he wished to come down for breakfast. He said he did.

She asked if he would like to have some tomato juice brought up to him. He said he would, and Mrs. Houston went downstairs, got the juice and put it on the stairway up by the bathroom because by that time Mr. Houston had gone into the bathroom to wash up.

He came out of the bathroom, drank the tomato juice and then came down the stairs in his bathrobe, and pajamas but without his glasses.

As he came down the stairs his daughter Ann was there putting up a bookshelf, and she was singing, "Oh, What A Beautiful Morning," and Mr. Houston's comment was, "It surely is."

Then Ann said to her father, "We're going to have steak for breakfast." He said, "That is fine," or "Sounds good," or words to that effect, and he walked on through the kitchen in which his wife was working, and down the stairway leading to the basement. In a few minutes both mother and daughter heard a thud or a shot. Mrs. Houston ran down to the basement and she found Mr. Houston there, shot, and she called to Ann to call the ambulance.

The physical facts show that the shooting happened in the middle of a narrow passageway with a low ceiling. Being a tall man Mr. Houston had to stoop while proceeding through the passageway. The body was found some fifteen to twenty-two feet from the place where the shot was fired, as after he was shot, Mr. Houston struggled this distance.

All of the witnesses familiar with Mr. Houston's habits testified that he kept guns all over his home, that he kept guns loaded from time to time, and that he kept shells all over his home. Mr. Houston was an outdoor type man, a sportsman who was accustomed to handling firearms, and who according to the testimony was careful with firearms. According to members of his family he frequently visited the basement dressed in bathrobe and slippers and it was not unusual for him to do so while awaiting completion of preparation of a meal.

It is defendant's claim that Mr. Houston rested the butt of the rifle on the floor of the basement, bent himself over the rifle parallel to the floor, and placed the muzzle of the gun up to his chest pointing at his heart. The bullet came out lower in Mr. Houston's back than when it entered his chest, which the defense claims shows that the death was suicide. The defense further claims that Mr. Houston could not possibly have tripped and fallen in view of the physical evidence. The plaintiff on the other hand has suggested several ways in which the shooting may have taken place, all as a result of accident.

The Court has studied all of the cases cited by counsel on both sides, some of which cases will be referred to later in this opinion, and has also reviewed the circumstances of this case including the events leading up to the tragedy and the physical facts themselves, and cannot conclude that the defendant has sustained the burden of proving that Mr. Houston's death was the result of suicide.

Regardless of the question of the burden of proof, if the court was of the view that the evidence presented spelled out but one conclusion, namely suicide, it would not hesitate entering judgment for defendant herein. As stated in Richardson v. New York Life Ins. Co., 4 Cir., 1949, 174 F.2d 475, " 'A suicide case should be tried as any other case, and metaphysical reasoning about presumptions and burden of proof should not be permitted to obscure the real issue, as has been done in so many cases.' " However, where the evidence has left the court with the definite view that the shooting may have been the result of accident, as the evidence has in this case, the burden of proof does have significant importance.

A review of some of the cases cited by counsel may be helpful. In practically all of the cases cited the question on appeal was whether the trial court should have directed a verdict for defendant insurance company.

In United States Fidelity & Casualty Co. v. Blum, 9 Cir., 270 F. 946, the burden was on plaintiff to prove that death was effected through external, violent and accidental means. Insured had fallen from a window. The evidence showed that he had been greatly disturbed by news of fire occurring in property of his in Alaska which he had learned of 10 days before; insured complained of loss of sleep. Court held that question of suicidal intent was for jury and therefore upheld finding of jury for plaintiff.

In the case of Long v. California-Western State Life Ins. Co., 43 Cal.2d 871, 279 P.2d 43, there was evidence of a declaration of suicidal intent by assured following an argument with his wife immediately prior to shooting. Question of fact for jury who weighed declarations and physical facts and determined suicide.

In New York Life Ins. Co. v. Alman, 5 Cir., 22 F.2d 98, the insured, the day before his death, made improper advances to a wife of a friend of his. When husband of woman talked with him about

event, insured replied that he, insured, ought to be killed or ought to kill himself. Husband advised him that he was going to expose him and left. Insured was found dead of a gunshot wound in his chest the next morning. The court noted the presence of motive, and refuted plaintiff's contention that the insured could not have deliberately fired the fatal shot. The court then discussed the factors which illustrate that insured could have deliberately fired the shot, therefore, overcoming this defense. In this case it can be seen that the court weighed the evidence and felt that the plaintiff (who had the burden of proof) did not sustain it, and that although the possibility of accident was not precluded, it was remote. Therefore, judgment had to be rendered in favor of the party not having the burden of proof.

In Aetna Life Ins. Co. v. Tooley, 5 Cir., 16 F.2d 243, the insured was fatally wounded in the right temple. The court noted that for a year or more preceding his death insured had been in bad health, and had become obsessed with idea that his friends and associates had ceased to value his friendship. The court held that the presumption against suicide was overcome by a preponderance of the evidence, and reversed judgment for the plaintiff.

In Burkett v. New York Life Ins. Co., 1 Cir., 56 F.2d 105, the burden was on the plaintiff to prove that death of insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means.

Insured was fatally wounded through roof of mouth into brain. He had visited family doctor on day of death, and physician testified that in his opinion the insured was neurotic. The court stated, "The insured's conduct in going for the gun during Sunday afternoon, in taking it and loaded shell without asking permission to do so, and then instead of returning to his home, going to a secluded spot in an urban business and residence locality, was consistent with the existence of suicidal intention * * *."

The particular issue in the present case is whether the wound in Mr. Houston's chest was intentionally or accidentally inflicted. The determination of this issue requires a consideration of all surrounding facts and circumstances. The cases cited by defendant all have one or more vital differences from the facts and circumstances here presented, such as location of the wound, kind of firearms used, and particularly statements indicating suicidal intent.

Defendant's counsel relies heavily on the position of insured's body and gun to establish suicide. Admitting for the sake of argument that these factors are consistent with suicide there is nothing else to support a suicide theory. It is uncontroverted that the gun could have been fired accidentally in one of several ways. The position of gun and body appears equally consistent with the theory of accident to this court.

Defendant refers to statements made by Mrs. Houston right after the shooting contained in the official Police Report made out by Officer Pine. Defendant's reference is to the italicized portions.

"Mrs. Houston said at first that he has periods of depression and was depressed lately. Later, however, she said that over this weekend he had been in fine spirits. She said he was not planning any hunting trip nor planning to do any shooting of any kind. Mrs. Houston pointed out a storeroom downstairs where he had two guns stored. She said also that he kept another gun in the corner of the basement section where he was found dead. Mrs. Houston said that he had been a hunter and outdoorsman all his life and was not careless with guns."

There is nothing startling or out of the ordinary contained in the wife's statements in that all of these matters were fully developed on the trial of this case. It was testified to that Mr. Houston was customarily a little depressed at this time of the year as he had an annual report to prepare in his business. The wife's statement to Officer Pine, it-

self, states that her husband was in fine spirits over the weekend.

The fact that Mr. Houston wasn't planning any hunting trip nor any shooting of any kind, does not seem overly significant to the court. There are many and varied reasons why Mr. Houston may have gone down into the cellar and taken this gun without having his own destruction in mind.

All of the witnesses that were familiar with Mr. Houston's habits testified that he was careful with firearms, but that he had said that people were careful with loaded guns and therefore the best way to keep people away from them is to load them and tell people so.

The time and place of the shooting does not in the court's view compel a conclusion of suicide. The facts show that Mr. Houston did on occasion go down into the basement to look at his guns. Defendant notes that the only shell in the gun was the one that was fired, from which it is alleged that the single shell had been inserted in the gun immediately prior to the shooting. However, this assumption is unwarranted in view of uncontroverted testimony of several witnesses that insured habitually kept loaded guns around the house.

Another factor to be considered is the fact that after the shot was fired, the insured, mortally wounded, crawled 15 or more feet from the narrow passageway in which the shooting took place toward the exit from the basement. In none of the cases cited by counsel did a person bent on self-destruction make any effort to change position after mortally wounding himself.

Other than the physical facts which do not preclude the possibility of accidental death, most of the surrounding facts and circumstances tend to support plaintiff's theory of accident. Motive is not a conclusive element where the physical facts clearly point to suicide, nevertheless many of the cases cited discuss the motive element, if for no other reason than to strengthen conclusions already drawn from the physical facts. In the instant case there is nothing, either in insured's actions or statements which would indicate suicidal intent or disposition. The insured was in good health, was successful in business and had no unusual financial worries or domestic difficulties. He had made definite plans and commitments for both the immediate and more distant future, and all witnesses agreed that insured was one who loved life and had every reason to live.

In the case of Beers v. California State Life Ins. Co., 87 Cal.App. 440, 262 P. 380, 390, appears the following statement: "As is true in its application to the proof of the commission of crimes, particularly in the proof of the crime of murder, the rule is that, while the proof of motive is not indispensable, yet the presence or absence of motive is a circumstance going to the question of the quality of the act under inquiry."

How does this statement apply to the present case? The physical facts do not spell out a clear case of suicide. There is room for speculation as to how the shooting actually took place. Certainly if motive factors were present they would influence the trier of fact as to the quality of the act under inquiry. The court cannot, in view of the physical evidence in this case, and the lack of proof of suicidal motive on the part of insured, come to the conclusion that defendant insurance company has shown by a preponderance of the evidence that insured committed suicide.

The defendant has moved to strike the testimony of Dr. Kirk and Mr. Bradford regarding certain tests made with the gun and bullets involved in the actual accident. The court must first state that it would reach exactly the same decision in this case whether this evidence was presented or not. The tests made were firing experiments and firing tests with the gun in question, with bullets exactly the same as the one that killed Mr. Houston, except that the lead slug had been removed from the gun for safety purposes, which removal in no way affected the tests on the mechanical operation of the gun. This evidence was uncontroverted. The testimony of Dr. Kirk and

Mr. Bradford was that this particular firearm due to its mechanical make-up could be fired by ways other than pulling the trigger, e. g., a blow on the butt or a blow on the hammer.

Defendant relies on Long v. California Western States Life Ins. Co., supra, and New York Life Ins. Co. v. Alman, supra, to support its contention that this evidence is inadmissible. It is the court's view that neither case precludes the admission of this evidence.

In the Long case a ballistic expert was produced to testify as to the results of tests he made tripping and falling with a gun to determine how he could produce wounds such as were inflicted on deceased. The court properly held that a qualified physician was the proper expert to testify relative to wounds which might result from a particular set of physical facts. A ballistic expert was not called in this case to testify as to the mechanical operation of the gun. Further, on the first trial of this case, a physicist, called as a witness for defendant, testified that he made numerous tests to determine whether the gun would discharge accidentally from any type of impact or shock, and that in those tests he was unable to cause the gun to discharge. No objection was made to this testimony nor did the court indicate that it was improper. Long v. California Western States Life Ins. Co., 111 Cal.App.2d 254, 244 P.2d 488.

In the Alman case results of experiments made with small shot fired from the barrel of the gun while it was held against and away from a cardboard box, were received in evidence for the purpose of showing the spread of shot and the presence or absence of powder marks, which were compared to those on deceased's body. The court held that for experiments to be admissible they must be made under conditions practically identical with the conditions they purport to illustrate, and that these experiments with the cardboard box should not be admitted in evidence in the event of a retrial.

The court is of the view that the tests made were admissible for the limited purpose of demonstrating that this gun could have been discharged other than by pulling the trigger.

In accord with the foregoing it is hereby Ordered that judgment be entered herein upon findings of fact and conclusions of law in favor of plaintiff and against the defendant, and that the respective parties pay their own costs.