Mario Pittoni, J.
On December 23,1964, at about 10:00 p.m., Edward Gr. Kent killed himself by firing a .22 caliber bullet from a semi-automatic pistol into the right temple area of his head. His wife now sues to recover the proceeds of a life insurance policy issued by defendant company. The policy precludes recovery of the proceeds if the insured committed suicide within two years from the date of issuance. Here, the death occurred 10 months after issuance.
Plaintiff contends that the killing was accidental and defendant company counters that it was suicide.
On the morning of December 23,1964, Kent arose, spoke to his wife about various topics of the day and also about Christmas, and thereafter left for business sometime before 10:00 a.m. He and a business associate visited various places and later also went shopping for Christmas gifts. Eventually, about 3:00 p.m., Kent and his associate went to an office party given by a vending company and both drank heavily. One estimate was that each had about 12 drinks between the hours of 3:00 p.m. and 7:00 p.m. During the latter period of that time Kent fought several times with a husband who disliked Kent’s attention to his wife. Apparently, Kent was bested at least once and found himself knocked to the ground. How this affected his ego as a “ ladies’ man ”, as he was described by his wife, is difficult to say. Eventually, Kent and his associate left the party in Kent’s car, with Kent driving. They drove first to the associate’s home and Kent then continued on toward his own. On the way he struck a parked vehicle, continued on without stopping and eventually arrived home about 9 :30 p.m. When Mrs. Kent opened the door he appeared to be drunk. Also, his shoes were muddy, his pants were torn, and he seemed to limp. When questioned by his wife, Kent denied that he had been in a fight but admitted he had been in an accident. While taking off his coat and jacket, Kent appeared to be very restless and seemed to be annoyed *84 about something. He was quiet, and when Mrs. Kent tried to find out what happened he did not say much. Later, when the phone rang, he refused to talk to anyone. At one point he lay down on the couch, but that did not seem to satisfy him. He then tried a pillow, but threw it on the floor. Finally he threw the bolster cushions from the back of the couch on the floor and lay down again. Next, he sat up and tried to pull off his tie, and when his wife cautioned him that he was ripping it, he answered, “ "What difference does it make? ”, and ripped it off. He also ripped off his shirt, causing the buttons to fly off. During this time Kent said, ‘‘ "Where is my gun? ” * * * “Is it in the car or in the house? ” Later, after a lag in the conversation, he again said, “ Are you going to get my gun? ” Mrs. Kent tried to distract him by talking about other things. However, he persisted by saying, “ If you really * * * want to help me, get my gun, get me a drink and get out of here ’ \ He repeated several times that he wanted her to get his gun, get him a drink and leave. When Mrs. Kent did not comply with his request Kent got up from the couch, went to the cabinet and took the gun. Mrs. Kent made no attempt to stop him. He returned to the couch and put the gun beneath his legs. Kent still kept suggesting that she leave or go to bed. Mrs. Kent refused and kept repeating that he go to sleep and that she would get the bed ready. While Mrs. Kent was in the bedroom preparing the bed she heard a click that she believed was the noise produced by pulling the slide back on a gun and allowing it to click forward. When she went back to the living room Kent was lying the same way that she had left him. He appeared annoyed and yelled at her to get out and to stop sneaking around corners. As soon as she had gone back into the bedroom she heard a shot and fearfully went back to the living room. There she found Kent in the same position in which she had left him. The only difference was a slight trickle of blood coming from his mouth. Fearful that he might try to use it again, she picked up the gun from the floor, put it on a table and went calling for help.
The police came a short while thereafter and immediately made their examinations and investigations for cause of death.
Detective Janelli, the Nassau County Police Department ballistics expert who examined the gun, found the gun cocked, a bullet in the chamber .of the gun, four bullets in the clip or magazine inside the handle of the gun and one bullet in the couch. The clip normally held six. Detective Janelli performed tests which established that a bullet, which was recovered from the *85 couch, and the bullet case, which was found on the sidewalk, had been fired from Kent’s gun. Other tests performed by Detective Janelli were the taking of paraffin casts of Kent’s hands and test firings of the gun. The paraffin casts tested for nitrite-nitrate deposits emanating from the gun when it was fired proved that Kent had held the gun in both hands when he fired it, and the test firings showed that the gun functioned normally without mechanical disorders. Detective Janelli also testified that someone would have to first insert a loaded clip in the gun to release the magazine safety, then cock the gun to place a round from the magazine into the gun chamber in position for firing, and finally place the thumb safety on the side of the gun in a position for firing. After these procedures were completed, the gun could then be fired by the pulling of the trigger. Detective Janelli also testified that any weapon held firmly against body tissue and then discharged would cause a large opening into the body, because in addition to the projectile, the gases, which would have no place to escape, would actually rip and blow apart any material that the gun was against.
Dr. Thurston Gaines, a Nassau County Assistant Medical Examiner, performed an autopsy the morning after Kent’s death. He, too, testified as to the entrance wound in Kent’s head. There was a 0.6 by 0.8 centimeter jagged laceration on the left temple just above and anterior to the pina of the left ear and a larger jagged laceration of the right temple measuring 2.0 by 0.8 centimeters. Around the edges of the right wound there were actually burns measuring 0.2 centimeters in width. Dr. Gaines said that the larger of the two wounds on the right temple was the “ entrance ” wound and that the smaller on the left temple was the “ exit ” wound. The left side of the skull contained a fracture where the bullet passed through it with the pieces of the fracture displaced outward. Dr. Gaines also said that the burn marks around the edge of the wound on the right side and the bones displaced outwardly on the left side lead to that conclusion that the bullet entered from the right side of the head. He further explained the larger hole on the right side of the head by saying that the gases that are discharged from the gun will blow a bigger hole at the place of entrance.
The toxicologist’s report showed that there was 0.169% alcohol in the blood taken from Kent’s brain. While Dr. Gaines testified that this showed Kent to be intoxicated according to legal standards, he could not say that Kent was medically intoxicated.
*86 I do not put much credence in the testimony of Kent’s former wife, Grace. She appeared too anxious to testify to her adultery with Kent after his marriage to plaintiff, primarily out of jealous vindictiveness against the woman who, according to her, had lured Kent away in the same fashion.
Besides these facts, defendant company offers for consideration Kent’s irresponsible behavior in the Army and in later life, and also that he was dedicated to the so-called pleasure principle and sought escape when things seemingly went wrong. Defendant company also points out how Kent continually spent money on luxuries without sufficient money to pay for them, and that he was always in debt even though at the time of his death he had a fair paying job.
Plaintiff, in turn, says there is no evidence of any motive for suicide and that his actions before and on the day of death showed a motive to live.
Plaintiff also urges as her strong point that Kent was so drunk that he was unable to form an intent to kill himself. In this respect Warnke, Kent’s associate, Kent’s wife and Dr. Gaines, the medical examiner, testified to Kent’s drunkenness. However, Dr. Gaines said that although he was drunk according to legal standards, he could not say that he was drunk according to medical standards.
The law presumes accidental or unintentional death as against suicide. If a fair question of fact is presented as to accident or suicide, the answer should be “accident”. (Begley v. Prudential Ins. Co., 1 N Y 2d 530; Wellisch v. John Hancock Mut. Life Ins. Co., 293 N. Y. 178.)
Unquestionably, suicide is the intentional taking of one’s own life. It requires intent to kill. Intent is the essence of the act and this presupposes a mind sound enough to form that intent (Shipman v. Protected Home Circle, 174 N. Y. 398, 405; New York Life Ins. Co. v. Pater, 17 F. 2d 963, 964 [C. C. A. 7th]).
It is undisputed that Kent shot and killed himself. What is in dispute is whether he intended to kill himself.
Intent or intention may be formed in the absence of or regardless of any motive or motivation. Motive or lack thereof is only some circumstantial evidence to establish or disprove intent or intention. In this case the motives discussed by the parties are relatively insignificant in the light of Kent’s actions on the day of his death.
The first question is whether Kent was so drunk that his mind could not form the intent to kill himself. It must be remembered that drunkenness by itself does not necessarily so *87 becloud, befuddle or obscure the mind as to prevent the formation of an intent to kill. (People v. Koerber, 244 N. Y. 147, 152,154; People v. Leonardi, 143 N. Y. 360, 365.) In the Koerber case (p. 154) the court said: “It is common knowledge that intoxicated men, although not in normal control of their faculties, do deliberate and premeditate and form a particular intent and commit criminal acts as they might not do if they were sober. Intoxication as such does not mitigate the offense. The question is not whether the accused was drunk but whether his intoxication was of such a character that it destroyed the power to form the particular intent”. In the Leonardi case (p. 365) the court said: “ That a man may be even grossly intoxicated and yet be capable of forming an intent to kill or do any other criminal act is indisputable ”.
Although not in full command of his reflexes or reason, Kent was able to drive his associate home, drive to his own home, get off and on the couch, adjust and throw pillows, undress himself, even though roughly, refuse to talk to anyone on the telephone, continually ask for his gun, ask for a drink, perhaps to fortify his courage, order his wife out of the living room, either to save her from the sight of the impending act or to avoid her interference, go and get the gun himself from a cabinet some distance away from the couch on which he .rested, go back onto the couch, prepare and cock the gun for shooting, and then put the gun to the right side of his head with both hands in such a way that the bullet entered his right temple and came out of his left temple. In all this, although Kent had become ill-tempered and morose, there was no evidence of mental confusion or irrationality. Nor was there any slurring of speech. His mind still was lucid and rational. These facts, exclusive of any motivation shown by both parties, conclusively establish Kent’s intent to kill himself.
The facts of this case establish suicide more firmly than Long v. California-Western States Life Ins. Co. (43 Cal. 2d 871, 883) where the court said: ‘ ‘ The facts here reviewed * * * make it almost impossible for a reasonable mind to reach any other conclusion than that the deceased committed suicide ”.
I find, therefore, that there is no evidence of accident, that Kent’s act of killing himself was deliberate and intentional, that there is no fair question as to accident or suicide and that the evidence points to only one conclusion — “suicide”. The complaint is dismissed.